PSI ENERGY, INC., Appellant–
Plaintiff,

v.

The HOME INSURANCE COMPANY,
et al., Appellees–Defendants.

No. 32A01–0204–CV–146.

Court of Appeals of Indiana.

Jan. 16, 2004.

Transfer Denied May 14, 2004.

Donald P. Bogard, Eric M. Cavanaugh, Cinergy Services, Inc., Plainfield, IN, George M. Plews, Jeffrey D. Claflin, Plews, Shadley, Racher & Braun Indianapolis, IN, Lester O. Brown, Thomas M. McMahon, Kenneth A. Remson, Howrey, Simon, Arnold & White, LLP, Los Angeles, CA, Lara A. Degenhart, Howrey, Simon, Arnold & White, LLP, Washington, D.C., Attorneys for PSI Energy, Inc.

Frank J. Deveau, Bradley R. Sugarman, Sommer, Barnard, Ackerson, Indianapolis, IN, Amicus Curiae The Indiana Manufacturers Assn.

Kevin J. Hinkle, Hinkle & Gibbs, Danville, IN, Robert V.P. Waterman, Jr., Judith L. Herrmann, Lane & Waterman, Davenport, IA, Attorneys for Commercial Union Insurance Company.

Pamela Paige, White & Raub, LLP, Indianapolis, IN, Charles W. Browning, Kenneth C. Newa, Plunkett & Cooney, P.C., Detroit, MI, Attorneys for The Travelers Indemnity Company.

James E. Rocap, Jeffrey B. Fecht, Rocap Witchger, LLP, Indianapolis, IN, Joseph A. Hinkhouse, Richard McDermott, Lord, Bissell & Brook, Chicago, IL, Attorneys for London Insurers.

Thomas J. Costakis, Krieg DeVault LLP, Indianapolis, IN, Timothy J. Fagan, Michael Resis, John D. LaBarbera, O'Hagan, Smith & Amundsen, LLC, Chicago, IL, Attorneys for Continental Casualty Company and Continental Insurance Company.

Mary K. Reeder, Riley, Bennett & Egloff, Indianapolis, IN, James S. Stickles, Laura J. McGrath, Kaplan & Von Ohlen Chicago, IL, Attorneys for The Home Insurance Company.

Thomas J. Costakis, Krieg DeVault LLP, Indianapolis, IN, Victor J. Piekarski, Ellen L. Green, O'Hagan, Smith & Amundsen, LLC, Wheaton, IL, Attorneys for General Reinsurance Corporation.

Wayne C. Turner, McTurnan & Turner, Indianapolis, IN, Michael R. Orlando, Cohn & Baughman, Chicago, IL, Attorneys for Century Indemnity Company.

Andrew W. Hull, Alice M. Morical, Hoover Hull Baker & Heath LLP, Indianapolis, IN, Amicus Curiae Complex Insurance Claims Litigation Association.

## OPINION

MATHIAS, Judge.

PSI Energy, Inc. ("PSI") has incurred substantial clean-up costs due to environ-

mental contamination at its former manufactured gas plant sites. After certain insurance companies ("the Insurers") refused to indemnify PSI for those clean up costs, PSI filed a complaint against those Insurers in Hendricks Superior Court requesting, in part, a declaratory judgment concerning the Insurers' obligations to PSI under the various insurance policies it purchased between 1950 and 1985. The parties filed motions for summary judgment raising several issues concerning whether PSI is entitled to coverage, including whether PSI "expected" or "intended" the property damage at issue and whether coverage was "triggered" under the policies.

The trial court denied several of the parties' motions for summary judgment finding that genuine issues of material fact precluded the entry of summary judgment. However, the trial court did grant the Insurers' motions for summary judgment with regard to whether PSI has submitted sufficient evidence to prove the terms and conditions of certain insurance policies that are lost. The trial court then entered a final judgment in favor of the Insurers on the lost policies issue. Both PSI and the Insurers appeal the trial court's rulings on the motions for summary judgment raising the following issues, which we consolidate and restate as:

I. Whether a justiciable controversy exists concerning five of the six sites at issue;

II. Whether genuine issues of material fact preclude entry of summary judgment on the timeliness of the notice PSI provided to the Insur-

ers of its claim at the Shelbyville site;

III. Whether the admissible evidence presented by PSI creates a genuine issue of material fact as to its ability to establish the terms and conditions of the lost policies;

IV. Whether genuine issues of material fact preclude entry of summary judgment on the Insurers' defense that PSI "expected" or "intended" the property damage at issue;[1]

V. Whether genuine issues of material fact preclude entry of summary judgment on PSI's contention that coverage under the policies has been "triggered" by the contamination at issue; and,

VI. Whether the trial court abused its discretion when it denied the Insurers' motions to strike the testimony of PSI's expert witness, Thomas Helfrich.

Concluding that the trial court properly found that genuine issues of material fact remain regarding notice, the "expected" or "intended" damage defense, and the trigger of coverage, but that the trial court erred when it granted the Insurers' motions for summary judgment on the lost policies issue, we affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

### Facts and Procedural History

This case involves a contractual dispute over insurance coverage for environmental contamination at six Indiana sites where gas was manufactured ("MGPs"). PSI and other companies operated MGPs in Bedford, Goshen, Greencastle, Lafayette, Sey-

---

1. Regarding the "expected" or "intended" damage defense, the parties have also raised the following sub-issues: 1) whether those Insurers whose policies do not contain the "expected" or "intended" language may assert the defense; 2) whether PSI bears the burden of proving that the damage was neither "expected" nor "intended;" and 3) whether a subjective or objective standard applies to determine whether PSI expected or intended the property damage at issue.

mour, and Shelbyville from the mid–1800s to approximately 1950. In 1945, PSI sold the MGPs at issue to the newly created Indiana Gas Company.

During the manufactured gas process at the MGP sites, tar was produced as a by-product. When the MGPs were dismantled, underground containment structures (which were usually constructed of brick or concrete) were often left in place and in most cases those structures continued to contain tar that was not extracted and properly disposed of at the time of sale or closure. During the 1980s and 1990s, environmental investigations revealed groundwater contamination at each of the six MGP sites. PSI has alleged that after the MGPs were decommissioned, tar and its related constituents leaked from the underground containment structures into the soil and groundwater at and around those sites. PSI has alleged that such environmental contamination has occurred continuously from the time the MGPs were decommissioned and has continued throughout the policy periods at issue in this case. In response, the Insurers generally allege that the groundwater contamination resulted from intentional dumping of MGP wastes during plant operations. PSI also alleges that its environmental clean up costs are estimated at thirty million dollars.

From 1950 through 1985, PSI purchased comprehensive liability policies from several insurance companies. These policies generally provided that the Insurers would pay "all sums" that PSI is legally obligated to pay as damages due to an "occurrence" of property damage or "accidental" property damage. PSI also purchased excess liability coverage from the named Insurers. However, PSI has not been able to locate copies of certain excess insurance policies it purchased during the 1950s through the 1970s from those Insurers.

All Insurers have generally refused to indemnify PSI for the environmental clean up costs associated with the six MGP sites.

In 1998, PSI filed a complaint against those Insurers in Hendricks Superior Court requesting, in part, a declaratory judgment concerning the Insurers' obligations to PSI under the various insurance policies purchased between 1950 and 1985. Specifically, PSI requested that the trial court find that the Insurers are obligated to pay PSI's pending and future environmental clean up costs at the MGP sites and award compensatory damages for their refusal to do so. The Insurers named in the complaint include Century Indemnity Company ("Century Indemnity"), Certain Underwriters at Lloyd's, London and Certain London Market Insurers ("London Insurers"), Commercial Union Insurance Company ("Commercial Union"), Continental Casualty Company ("Continental Casualty"), General Reinsurance Corporation ("General Reinsurance"), Home Insurance Company ("Home Insurance"), and Travelers Indemnity Company ("Travelers Indemnity").

On September 7, 2001, the parties filed cross-motions for summary judgment. The Insurers' motions raised several issues, which included: 1) whether PSI submitted sufficient evidence to establish the terms of the policies that are lost; 2) whether PSI "expected or intended" the property damage for which it seeks coverage; 3) whether the policies have been "triggered" by groundwater contamination at and around the six MGP sites; and, 4) whether PSI provided timely notice to the Insurers with respect to the Shelbyville MGP site. The Insurers also filed a motion to strike the testimony of one of PSI's experts, Thomas Helfrich, which was denied. Finally, in its motion for summary judgment, Commercial Union argued that

no justiciable controversy existed with regard to five of the six MGP sites at issue.

In pertinent part, PSI raised the following issues in its motion: 1) whether the Insurers bear the burden of proving that PSI "expected or intended" the property damage for which it seeks coverage; and, 2) whether PSI's policies have been "triggered" by the groundwater contamination at and around the MGP sites.

On February 1, 2002, the trial court issued its order on the parties' cross-motions for summary judgment. In the order, the trial court granted the Insurers' motion on the issue of the lost policies finding that PSI's evidence is "insufficient as a matter of law for a trier of fact to cast liability upon an insurer for the coverage demanded." Appellant's App. p. 105. On March 25, 2002, the trial court entered a final judgment in favor of those Insurers on the lost policy issue. PSI then filed a notice of appeal.

In its February 1, 2002 order, the trial court also denied summary judgment on the issue of whether the property damage was "expected or intended," finding remaining genuine issues of material fact. The trial court also denied the parties' motions for summary judgment on the "trigger of coverage issue" finding that the timing of the groundwater contamination is a question of fact that must be resolved by a jury. The court then determined that the policies have been triggered if groundwater contamination took place during the policy period. Further, the trial court denied the Insurers' motion to strike Helfrich's expert opinion. Commercial Union's motion for partial summary judgment on the issue of justiciability was also denied. Finally, the trial court determined that the Insurers did not suffer actual prejudice from the timing of PSI's notice, and denied

summary judgment on that issue. Appellant's App. pp. 104–07.

PSI then filed a motion requesting that the trial court clarify its ruling on the issues of the "expected or intended" damage defense and "trigger of coverage." The trial court denied the motion on April 1, 2002; however, it did make the following findings: 1) under Indiana law, the insured bears the burden of proving that the property damage was neither expected nor intended; 2) an objective standard is applied to determine whether the insured expected or intended the damage to occur; and 3) groundwater contamination does not trigger coverage simply because it continues to exist; however, if new water becomes contaminated during a policy period, the contamination will have "continued" through successive periods if there exists a continuous stream of new property damage. Appellant's App. pp. 110–11. The trial court then certified its orders for interlocutory appeal. Our court accepted jurisdiction of the interlocutory appeal and consolidated that appeal with the "lost policies" appeal. Additional facts will be provided as necessary.[2]

## Standard of Review

■ Our standard of review of a summary judgment motion is the same standard used in the trial court:

Summary judgment is appropriate only where the evidence shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. All facts and reasonable inferences drawn from those facts are construed in favor of the non-moving party. The review of a summary judgment motion is limited to those materials designated to the trial court. We must carefully review decisions on sum-

---

**2.** Oral argument was held in this case in Indianapolis on November 5, 2003, and we commend counsel for the quality of their written and oral appellate advocacy.

mary judgment motions to ensure that the parties were not improperly denied their day in court.

*Tom–Wat, Inc. v. Fink,* 741 N.E.2d 343, 346 (Ind.2001) (citations omitted). Our standard of review is not altered by cross-motions for summary judgment. *Ind. Ins. Co. v. Am. Cmty. Servs., Inc.,* 718 N.E.2d 1147, 1152 (Ind.Ct.App.1999).

■ "The purpose of summary judgment is to terminate litigation about which there can be no material factual dispute and which can be resolved as a matter of law." *Ebersol v. Mishler,* 775 N.E.2d 373, 378 (Ind.Ct.App.2002), *trans. denied.* Therefore, "[a] party seeking summary judgment bears the burden of showing the absence of a factual issue and his entitlement to judgment as a matter of law." *Harco, Inc. of Indianapolis v. Plainfield Interstate Family Dining Assoc.,* 758 N.E.2d 931, 937 (Ind.Ct.App.2001) (citation omitted). All pleadings, affidavits, and testimony are construed liberally and in the light most favorable to the nonmoving party. *May v. Frauhiger,* 716 N.E.2d 591, 594 (Ind.Ct.App.1999). For summary judgment purposes, a fact is "material" if it bears on ultimate resolution of relevant issues. *Yin v. Soc'y Nat'l Bank Ind.,* 665 N.E.2d 58, 64 (Ind.Ct.App.1996), *trans. denied.* "[A]ny doubt as to the existence of an issue of material fact, or an inference to be drawn from the facts, must be resolved in favor of the nonmoving party." *Am. Mgmt., Inc. v. MIF Realty, L.P.,* 666 N.E.2d 424, 428 (Ind.Ct.App.1996).

■■ "Even if it appears that the nonmoving party will not succeed at trial, summary judgment is inappropriate where material facts conflict or undisputed facts lead to conflicting inferences." *Link v. Breen,* 649 N.E.2d 126, 128 (Ind.Ct.App. 1995), *trans. denied; see also Gen. House-*

*wares Corp. v. Nat'l Sur. Corp.,* 741 N.E.2d 408, 412 (Ind.Ct.App.2000) ("On appeal, we must carefully scrutinize an entry of summary judgment to ensure that the non-prevailing party is not denied his or her day in court."); *Brunner v. Trs. of Purdue Univ.,* 702 N.E.2d 759, 760 (Ind. Ct.App.1998), *trans. denied* ("Summary judgment should not be used as an abbreviated trial."). Finally, "[o]ur analysis proceeds from the premise that summary judgment is a lethal weapon and that courts must be ever mindful of its aims and targets and beware of overkill in its use." *Bunch v. Tiwari,* 711 N.E.2d 844, 847 (Ind.Ct.App.1999).

## I. Justiciability

■ In its cross-appeal, Commercial Union argues that the undisputed material facts establish that no justiciable controversy exists with regard to five of the six MGP sites at issue; therefore, the trial court erred when it denied its motion for partial summary judgment.[3] At each site, Commercial Union policy number AW–8500–380 provided $10,000,000 of excess liability coverage in excess of Home Insurance company's $5,000,000 policy limits, under which PSI's self-insured retention amount (i.e. deductible) was $25,000. Commercial Union contends at the five sites at issue, the total estimated past and future clean up costs do not reach the applicable attachment point for coverage, or $5,025,000.

■ Pursuant to the Declaratory Judgment Act, "[a]ny person interested under a . . . written contract, . . . or whose rights, status, or other legal relations are affected by a . . . contract, . . . may have determined any question of construction or validity arising under" the contract and "obtain a declaration of rights, status, or

---

**3.** Commercial Union does not raise this argument with regard to the MGP site at Goshen.

other legal relations thereunder." Ind. Code § 34–14–1–2 (1999). To obtain declaratory relief, "the person bringing the action must have a substantial present interest in the relief sought." *Hibler v. Conseco, Inc.*, 744 N.E.2d 1012, 1023 (Ind. Ct.App.2001) (citing *Town of Munster v. Hluska*, 646 N.E.2d 1009, 1012 (Ind.Ct. App.1995)). "The basis of jurisdiction under the Declaratory Judgment Act is a justiciable controversy or question, which is clearly defined and affects the legal right, the legal status, or the legal relationship of parties having adverse interests." *Id.* (citing *Nass v. State ex rel. Unity Team*, 718 N.E.2d 757, 764–65 (Ind.Ct. App.1999), *trans. denied*).[4]

The standing doctrine constitutes a substantial restraint upon Indiana courts. *Pence*, 652 N.E.2d at 488.

> For the disposition of cases and controversies, the Court requires adverse parties before it. Standing focuses generally upon the question whether the complaining party is the proper person to invoke the Court's power. However, more fundamentally, standing is a restraint upon this Court's exercise of its jurisdiction in that we cannot proceed where there is no demonstrable injury to the complainant before us.

*Id.* (citation omitted). To establish standing, a plaintiff must demonstrate that he or she has sustained, or was in immediate danger of sustaining, some direct injury as a result of the conduct at issue. *Id.; see also Hibler*, 744 N.E.2d at 1023.

In support of its argument that there is no justiciable controversy, Commercial Union relies on a vacated decision of the United States District Court for the Northern District of Indiana. In *Indiana Gas, Inc. v. Aetna Casualty and Surety Company*, 946 F.Supp. 627, 633 (N.D.Ind. 1996), *rev'd on jurisdictional grounds*, 141 F.3d 314 (7th Cir.1998), *cert. denied*, the court dismissed Indiana Gas's request for declaratory judgment with respect to certain MGP sites concluding that no justiciable controversy was presented.

> At present, the controversy alleged in plaintiffs' complaint for declaratory judgment relating to those sites is nothing more than hypothetical: if a government agency issues an order or notice; or if an agency requires plaintiffs to take some action with regard to the sites; or if a third party makes a claim; or if a third party files litigation against plaintiffs based on contaminants at those sites; *or if plaintiffs incur costs to clean up the sites, there may be coverage for those currently non-existent claims, orders, directives or costs.* Such are now mere possibilities, not probabilities, and accordingly the motion to dismiss must be granted.

*Id.* (emphasis added). In reaching this conclusion, the court relied on decisions from the Eighth and Eleventh Circuits in which "it [was] not clear whether either the state or federal government would ever require a clean-up since no notices, orders, claims, litigation or directives have been issued regarding the sites." *Id.* at

4. We note that the limits placed on justiciability under Article III of the United States Constitution as applied by the federal courts have no direct applicability to a standing analysis under Indiana law. *Pence v. State*, 652 N.E.2d 486, 488 (Ind.1995). However, the Indiana Constitution places similar limits upon the jurisdiction of our courts. *Id. See also Hibler*, 744 N.E.2d at 1023 ("Although the Indiana constitution contains no "case or controversy" requirement, the federal limits on justiciability are instructive, because the standing requirement under both federal and state constitutional law fulfills the same purpose: ensuring that the litigant is entitled to have the court decide the merits of the dispute or of particular issues.").

632 (citing *Gopher Oil Co. v. Bunker*, 84 F.3d 1047, 1051 (8th Cir.1996); *Atlanta Gas & Light v. Aetna*, 68 F.3d 409, 415 (11th Cir.1995)).

The facts of this case are clearly distinguishable. At each of the five sites at issue, the Indiana Department of Environmental Management ("IDEM") is overseeing site remediation activities. Commercial Union App. p. 445. IDEM also maintains the ultimate authority to determine appropriate levels of investigation and clean up at the sites. *Id.* Further, "IDEM has not declared the clean up of any PSI MGP Site as complete, nor has it granted a covenant-not-to-sue.... There is currently ongoing investigation, monitoring and/or remediation at all of the MGP Sites and it is likely that IDEM will require further activities at all of these sites." *Id.* PSI has already incurred and will continue to incur clean up costs for each of the five sites at issue.[5] Therefore, we conclude that a "real controversy" exists, and the trial court properly denied Commercial Union's partial motion for summary judgment on this issue.

## II. Notice

■■■ The Insurers filed motions for summary judgment alleging that PSI failed to provide timely notice of claims arising from the Shelbyville MGP site.[6] In denying the motions, the trial court found:

1. The Court does not need to reach a conclusion as to the timeliness of the notice to the insurer as the Court finds as a matter of law that the insurers did not suffer actual prejudice from the timing of the notice from PSI.[7]

2. The [Insurers] were well aware of and had actual knowledge of the facts and circumstances of the sites at issue.

3. The [Insurers] had the information that was alleged in the complaint, they knew about the prior settlement, had documents, and had interviewed witnesses.

4. Additionally, the [Insurers] have had complete and thorough discovery in this case.

Appellant's App. p. 106. In their cross-appeal, the Insurers argue that the trial court erred when it denied their motion for summary judgment. Specifically, the Insurers contend that PSI failed to present sufficient evidence to rebut the presumption of prejudice to their ability to prepare an adequate defense. PSI asserts that its notice to the Insurers was timely.

■■■ "The duty to notify an insurance company of potential liability is a condition precedent to the company's lia-

---

5. At the time Commercial Union filed its motion for partial summary judgment on this issue, PSI had already incurred total costs of $2,667,328 for the five sites at issue and its future total expenses were estimated at $11,326,093. Commercial Union App. pp. 418–428.

6. Generally, the policies at issue provide that when an occurrence takes place which "appears reasonably likely" to involve the insurer's policy, the insured must provide notice "as soon as practicable." *See e.g.* Appellant's App. p. 1209.

7. We note that where an insured's notice is found to be untimely, such unreasonable delay triggers a presumption of prejudice to the insurer's ability to prepare an adequate defense. *See Sutton v. Littlepage*, 669 N.E.2d 1019, 1023 (Ind.Ct.App.1996). If the insured can present "some evidence" that prejudice did not occur, "the question becomes one for the trier of fact to determine whether any prejudice actually existed." *Id.* (citation omitted). Therefore, prejudice will not be presumed absent a finding that the insured's notice was untimely. Here, the trial court failed to make such finding; however, as is discussed below, we are not required to reverse the trial court on this issue as we find that existing issues of material fact preclude summary judgment.

bility to its insured." *Askren Hub States Pest Control Servs., Inc. v. Zurich Ins. Co.*, 721 N.E.2d 270, 277 (Ind.Ct.App.1999) (citing *Shelter Mut. Ins. Co. v. Barron*, 615 N.E.2d 503, 507 (Ind.Ct.App.1993), *trans. denied*). An insured's noncompliance with notice of claim provisions, which results in an unreasonable delay, triggers a presumption of prejudice to the insurer's ability to prepare an adequate defense. *Id.* at 278 (citing *Miller v. Dilts*, 463 N.E.2d 257, 265 (Ind.1984)). In *Miller*, our supreme court stated:

> The requirement of prompt notice gives the insurer an opportunity to make a timely and adequate investigation of all the circumstances surrounding the accident or loss. This adequate investigation is often frustrated by a delayed notice. Prejudice to the insurance company's ability to prepare an adequate defense can therefore be presumed by an unreasonable delay in notifying the company about the accident or about the filing of the lawsuit. This is not in conflict with the public policy theory that the court should seek to protect the innocent third parties from attempts by insurance companies to deny liability for some insignificant failure to notify.

463 N.E.2d at 265. Finally, *when the facts of the case are not in dispute,* what constitutes reasonable notice is a question of law for the court to decide. *Askren,* 721 N.E.2d at 278 (emphasis added).

 In this case, PSI owned the Shelbyville MGP from 1923 to 1945, at which time it sold the site to Indiana Gas. In 1988, the Indiana Cities Water Corporation ("the ICWC") filed a lawsuit in federal court alleging that several defendants, including Indiana Gas, had contaminated or threatened to contaminate its underground water wells. Thereafter, in November 1988, Indiana Gas filed a third party complaint against PSI alleging that PSI was responsible for contamination at the Shelbyville MGP site and seeking reimbursement of Indiana Gas's response costs. Appellant's App. p. 5500. The defendants, including Indiana Gas and PSI, entered into a comprehensive settlement in May 1991, whereby PSI was obligated to pay $500,000 to the ICWC.

Further, in 1989, IDEM joined PSI and Indiana Gas in an existing enforcement action in connection with the Shelbyville MGP site, in which IDEM alleged that PSI deposited contaminates and/or allowed contaminates to discharge into the groundwater in violation of Indiana law. In November, 1990, PSI notified its then current liability carrier, Associated Gas & Electric Insurance Company, of the ICWC lawsuit and the IDEM action.

Despite the ICWC litigation and the IDEM enforcement action, PSI has alleged that in 1990 it was not aware of the full extent or timing of the groundwater contamination because only small quantities of contaminates had been found, and that it was not aware of the extent to which it might have to contribute to remediation at the site. PSI also alleged that only minimal investigative work was performed at the site prior to May 1993. After further investigation of the groundwater contamination, PSI provided notice to its remaining liability carriers on May 21, 1993. Approximately four years later, in 1997, PSI and Indiana Gas settled their proportionate liabilities with regard to the Shelbyville MGP when they entered into a site participation agreement, and in 1998, PSI entered into an agreed order with IDEM.

The lengthy site investigation and expert opinion sought in this case concerning when the groundwater contamination occurred at the Shelbyville MGP leads us to the conclusion that genuine issues of material fact remain with regard to whether

PSI's notice to the Insurer's was timely.[8] The circumstances presented in this case are clearly distinguishable from those cases involving automobile accidents or personal injury claims. Here, without substantial investigation, it was not possible for PSI to determine on which date(s) the "occurrence(s)" took place. That information was essential to PSI's determination of which Insurers were potentially liable under the numerous policies it had purchased between 1950 and 1985. Under these unique circumstances, we conclude that there are genuine issues of material fact with regard to whether PSI's May 21, 1993 notice to the Insurers was timely. Therefore, we hold that the trial court properly denied the Insurers' motions for summary judgment on this issue.[9]

### III. Lost Policies

PSI argues that it has submitted sufficient evidence to create a genuine issue of material fact concerning the existence and terms of certain lost insurance policies, and therefore, the trial court erred when it granted the Insurers' motions for summary judgment. The Insurers generally contend that PSI's evidence is merely speculative as to the alleged coverage provided by the policies and is insufficient to create a genuine issue of material fact.

Indiana Evidence Rule 1004 provides that where an original writing is lost or destroyed other evidence of the contents of the writing is admissible, unless the proponent lost or destroyed the writing in bad faith. It is undisputed that the policies at issue in this case are lost and there is no allegation that PSI acted in bad faith. Consequently, we are called upon to determine what an insured must prove in order to establish its rights under a lost or destroyed insurance policy.

The Insurers contend that our courts have generally required a proponent of a lost document "to establish the proof of its contents by 'reasonable certainty.'" Br. of Appellee Commercial Union at 21 (citing *Thompson v. Thompson*, 9 Ind. 323, 334, 1857 WL 3615 (1857); *Armstrong v. Azimow*, 118 Ind.App. 213, 215, 76 N.E.2d 692, 693 (1948)). In *Thompson*, a case concerning a lost deed, our supreme court indicated that in proving the contents of a lost instrument, "vague and uncertain recollections will not do;" however, "a degree of precision which the memory never retains, is not required." 9 Ind. at 333–34. The court then determined that the contents of the deed were "required to be proved with reasonable certainty[.]" *Id.* at 334.

The Insurers also rely on *Farm Bureau Mutual Insurance Co. v. Grills*, 135 Ind. App. 579, 196 N.E.2d 81 (1964), in which the insurance company allegedly issued a

---

**8.** PSI argues in its brief that it is remarkable that

> the same Insurers alleging late notice also dispute their coverage obligations on the ground that there was no "occurrence" during the policy period. These positions are wholly inconsistent. On the one hand, Insurers contend that PSI had enough information in 1988 to determine that a covered "occurrence" had taken place during their policy periods such that PSI's notice obligation was triggered. On the other hand, Insurers dispute coverage because they claim not to have been provided with enough information—even now—to show

> there was a covered "occurrence" during their policy periods.

Reply Br. of PSI at 35.

**9.** Further, because the Insurers merely allege that evidence was lost or destroyed as a result of the timing of PSI's notice without describing any such evidence specifically, and for the reasons set forth in the trial court's order, we observe that, even if PSI's notice is deemed untimely by the trier of fact, genuine issues of material fact remain with regard to whether the Insurers were prejudiced by the timing of PSI's notice.

policy to Grills, but the only evidence supporting that allegation was Grills' application for insurance coverage listing policy limits for certain types of coverage. *Id.* at 582, 196 N.E.2d at 83. Despite this limited evidence, Grills obtained a verdict in the amount of $1000 for medical expenses incurred due to injuries he suffered after he was struck by a motor vehicle. *Id.* at 580–81, 196 N.E.2d at 82. On appeal, our court stated:

> Assuming, without deciding, in favor of the verdict, that there was evidence from which the jury could have drawn the reasonable inference that the appellant insurance company "agreed" "to insure" appellee, as is alleged in the complaint, there is no evidence affording the jury any inference as to the terms and conditions of such agreed insurance or that appellee was to be insured against medical expenses for injuries sustained by reason of being "struck by a land motor vehicle."

*Id.* at 583, 196 N.E.2d at 83. The Insurers contend that like the circumstances in *Grills*, in this case, PSI has submitted some documentation concerning policy periods and limits, but "the secondary evidence submitted by PSI is speculative as to whether the lost polic[ies] provided insurance coverage for the alleged property damage at former MGP sites." Br. of Appellee Commercial Union at 24.

Although the case law discussed above is instructive in our resolution of this issue, our courts have never specifically determined what an insured must prove in order to establish the terms and contents of a lost insurance policy. Further, unlike the primary coverage at issue in *Grills*, the lost policies in this case provide excess coverage. Therefore, we now turn to decisions from other jurisdictions for guidance.

In support of its argument, PSI relies on *Dart Industries, Inc. v. Commercial Union Insurance Company*, 28 Cal.4th 1059, 124 Cal.Rptr.2d 142, 52 P.3d 79 (2002). In *Dart*, the California Supreme Court initially observed that the contents of lost documents may be proved by secondary evidence and further that "the law does not require the contents of such documents to be proved verbatim." *Id.* at 85–86 (citation omitted). The court also noted that California courts have routinely held that secondary evidence sufficient to prove the "substance" of the document is all that is required. *Id.* at 86. Relying on the general rule that a party bears the burden to prove each fact that is essential to its asserted claim for relief or its defense, the court ultimately concluded that:

> the claimant has the burden of proving (1) the fact that he or she was insured under the lost policy during the period in issue, and (2) the substance of each policy provision essential to the claim for relief, i.e., essential to the particular coverage that the insured claims. Which provisions those are will vary from case to case[.] ... In turn, the insurer has the burden of proving the substance of any policy provision "essential to the ... defense," i.e., any provision that functions to defeat the insured's claim. Those provisions, too, will be case specific.[10]

*Id.* at 87–88 (internal citations omitted).

In concluding that Dart had presented sufficient evidence to prove the substance

---

**10.** The court also stated that while it is generally true that courts look to the language of a contract to determine its meaning,

> it is equally true that when a contract has been lost in good faith, and the actual language is unavailable, the law does not require proof of such language. Rather, as discussed above, the proponent of the lost document need only prove the relevant substance of the document.

of the contents of the policy, the court relied on the following evidence:[11] 1) the testimony of an insurance broker who had participated in meetings at which the coverage under the policy was discussed and who testified that there was an occurrence based coverage provision in the policy; 2) evidence of two similar product liability claims filed against Dart that Commercial Union paid in which the plaintiffs claimed damages for injuries caused by ingestion of an allegedly harmful drug, which were not discovered until after the policy period had expired; and, 3) documentary evidence concerning the policy limits *Id.* at 90–91.[12]

The United States District Court for the Western District of Michigan also recently considered this issue in *Century Indemnity Company et al. v. Aero–Motive Company et al.*, 254 F.Supp.2d 670 (W.D.Mich. 2003). In that case, the court stated that "[t]o sustain its burden in a 'lost policy' case, an insured must present secondary evidence establishing both the issuance and terms of the policy, including the named insured; the period of coverage; the types of coverage; and the limits of coverage." *Id.* at 680 (citing *LeVere v. Aetna Cas. & Sur. Co.*, 208 Mich.App. 622, 528 N.W.2d 838, 839 (1995)). Such secondary evidence includes documentary evidence, such as binders and declarations pages, testimony from the agents and brokers who obtained the insurance for the insured, testimony from the insurer's representatives, insurance policy reconstruction expert opinions, and any standard policy forms used by the insurer during the

relevant policy period. *Id.* The court also observed:

> While a copy or a reasonable facsimile of the policy is not an absolute requirement for an insured to establish coverage, an insured cannot meet its burden merely by "relying on some contemporaneous version of the policy that it has secured from [the insurer or] other parties . . . absent some clear link, such as there being only one version of the policy, direct testimony linking the sample policy to the one issued, or solely cosmetic differences between versions." In other words, the evidence must allow more than mere speculation regarding the terms and existence of coverage.

*Id.* (internal citations omitted).

In the pending case of *Central Illinois Light Company v. The Home Insurance Company et al.*, 342 Ill.App.3d 940, 277 Ill.Dec. 45, 795 N.E.2d 412 (2003), *appeal allowed*, the Illinois Court of Appeals considered this issue in connection with similar litigation involving environmental contamination of MGP sites in that state. In that case, the insured argued that it had presented sufficient evidence of the lost policies' existence and terms to create a genuine issue of material fact. *Id.* at 430. Observing that the insured had introduced evidence that included correspondence, evidence of reinsurance, " 'placing slips' signed or stamped by the lead London underwriter indicating his acceptance of the risk," which contained evidence of policy periods, type of coverage, policy limits,

---

*Id.* at 89.

**11.** The insurer did not dispute Dart's assertion that the lost policy was a comprehensive general liability policy and that it was in effect from September 1, 1946 to September 1, 1951. *Id.* at 88. It was also undisputed that the policy at issue was a manuscript policy (a policy specifically designed for the

insured); therefore, it was unlikely that specimen policies or standardized policies would be useful in establishing its contents. *Id.* at 89.

**12.** *See also Rubenstein v. Royal Ins. Co. of Am.*, 44 Mass.App.Ct. 842, 694 N.E.2d 381, 384 (1997).

and policy premiums, the court concluded that the trial court erred when it granted the insurers' motion for summary judgment on the lost policies issue. *Id.* at 420, 430–31.

Further, the insured argued that the trial court abused its discretion when it denied its motion for additional discovery requesting that the insurer produce standard or sample policy language in use by the insurer during the policy periods at issue. The court agreed stating that the sample policy language requested by the insured "is highly relevant to this case" because it may aid the insured "in establishing the essential terms of its missing policies." *Id.* at 430. *See also Aero–Motive Co.*, 254 F.Supp.2d at 680–81 (evidence including internal business documents, the affidavit of an insurance reconstruction expert, testimony from an insurance company representative, and a schedule of underlying policies was sufficient to prove the terms of the lost policies).

Conversely, in *Harrow Products, Inc. v. Liberty Mutual Insurance Company et al.*, 64 F.3d 1015, 1021 (6th Cir.1995), the court concluded that the insured had not submitted sufficient evidence to create a genuine issue of material fact. The court held that the insured's evidence, which "amounts to a four-page, twelve paragraph affidavit" by one of the insured's former employees, whose responsibilities included purchasing insurance policies, was "far from substantial." *Id.* at 1021. The court noted, "[u]nfortunately, what [the employee] cannot testify to is the contents of the policies, the scope and amount of coverage, the various rights and responsibilities of the parties, or the notification requirements, to name just a few aspects." *Id.*

▮ Turning to the evidence submitted concerning the lost policies at issue in this case, generally, PSI has submitted secondary evidence with regard to the lost policies, including internal business records such as records of premium payments and records describing the policy periods and limits of PSI's liability coverage. For example, with regard to lost policy number HI–100220, which was issued by Harbor Insurance Company, a predecessor-in-interest to Appellee Continental Casualty, PSI submitted the following documentary evidence: 1) business records listing PSI's "excess general public liability and property damage insurance," which describe the premiums, policy periods, policy limits, and state that the policies "cover[ ] our legal liability for injuries or deaths to persons . . . and damages to property of others;" and 2) a record of insurance premium payments.[13] *See* Appellant's App. pp. 7229–36. Also, a document listing PSI's insurance coverage for September 1, 1961 to September 1, 1964, states: "Harbor Insurance Company–Picking up the coverages cancelled under Stuyvesant Policy for one year—9/1/63 to 9/1/64." Appellant's App. p. 7229.

PSI also submitted the report and deposition testimony of Robert Hughes ("Hughes"), an insurance expert, who testified regarding the likely wording of the lost policies. Hughes described his methodology for establishing the terms of the lost policies in a report submitted by PSI. *See* Appellant's App. pp. 2526–61. In reaching his conclusions, Hughes relied on his knowledge of the historical development of excess liability policies, the standard forms for excess liability coverage used by the insurance industry in the 1950s and 1960s, PSI's internal business

---

**13.** PSI's evidence submitted with regard to each lost policy at issue is substantially similar to the evidence described above.

records, and copies of policies of the underlying coverage. With regard to the lost excess liability policies, Hughes generally opined that the terms and conditions of the excess policies would follow those of the underlying policy. A copy of the underlying policy is available and in the record regarding all Insurers' excess coverage policies at issue, except one.[14] *See e.g.* Appellant's App. p. 2546. Hughes also testified that the terms of the excess liability policies would be "at least as broad as" the underlying policies. *See e.g.* Appellant's App. p. 3780.

However, during his deposition, Hughes also admitted that he could not testify to the terms and conditions of the lost policies with any degree of certainty. For example, with regard to lost policy number S11070, which was issued by Employers Surplus Lines, a predecessor-in-interest to Appellee Commercial Union, while Hughes opined that it was more likely than not that the policy would follow the form of the underlying policies, he admitted that the policy could be a manuscript policy with differing terms and conditions or that it could follow form, but with separate endorsements. Appellee Commercial Union's App. pp. 370–71. With regard to most lost policies, Hughes admitted that it was possible that even if the lost policies followed form with the underlying policies that they could also have separate endorsements or that the policies could have their own terms and conditions. *See e.g.* Appellant's App. pp. 3778–79.

In its order, the trial court made the following findings with regard to the evidence submitted concerning the lost policies:

6. The designated materials make numerous references to various pieces of evidence that PSI submits as proof that the policies did exist. This evidence alone is insufficient as a matter of law for a trier of fact to cast liability upon an insurer for the coverage demanded.

7. PSI's only evidence as to the type and or terms of the insurance contracts is through the testimony of its expert witness, Robert Hughes.

8. The testimony of Mr. Hughes is replete with speculation as to what terms or type of policy existed.

Appellant's App. p. 105. The trial court then determined that Hughes' conclusions were not supported by sufficient evidence. *Id.*

PSI argues that the trial court erred when it determined that Hughes' testimony was speculative and that "the degree of certainty in which an opinion or conclusion is expressed concerns the weight to be accorded the testimony, which is [a] matter for the jury to resolve." Br. of Appellant at 24, 26. In support of this argument, PSI relies on *Smith v. Beaty*, 639 N.E.2d 1029 (Ind.Ct.App.1994), in which our court stated, " 'an expert's opinion that something is 'possible' or 'could have been' may be sufficient to sustain a verdict or award' when rendered in conjunction with other, probative evidence establishing the material factual question to be proved." *Id.* at 1034 (citing *Noblesville Casting Div. of TRW, Inc. v. Prince*, 438 N.E.2d 722, 731 (Ind.1982)). However, as the Insurers

---

14. With regard to one of the lost policies, policy number XPL 1055 effective March 10, 1950 to March 10, 1951, which was issued by International Insurance Company of North America, a predecessor in interest to Appellee Century Indemnity, a copy of the underlying policy (number CL9382 issued by Massachusetts Bonding Company) cannot be located in the record. However, it appears that Hughes relied on that underlying policy when issuing his report and in its brief, Century Indemnity does not dispute that the applicable underlying polices are in the record.

note, in *Smith,* we also stated, "[i]t is true that standing alone, an opinion which lacks reasonable probability is not sufficient evidence by itself to support a verdict." *Id.* (citing *Noblesville,* 438 N.E.2d at 731). *See also Colen v. Pride Vending Serv.,* 654 N.E.2d 1159, 1163 (Ind.Ct.App.1995), *trans. denied* ("Testimony based on conjecture or speculation is insufficient to support a claim. . . . The failure of an inference may occur as a matter of law when the intended inference can rest on no more than speculation or conjecture.").

 In this case, PSI submitted secondary evidence establishing the existence of the lost excess insurance policies, including the policy limits and policy periods, and has submitted copies of the underlying policies.[15] Hughes utilized this evidence and his own knowledge of the insurance industry to form his opinion that it is more likely than not that the terms of the excess liability policies would be "at least as broad as" the underlying policies.[16] Extremely important to our resolution of this issue is the fact that PSI's claim is for *excess* coverage and all but one of the underlying, primary policies for the time period at issue have been submitted and are part of the record on appeal. Remembering that summary judgment should not be used as an abbreviated trial, we conclude that PSI has submitted sufficient evidence on this issue to create a genuine issue of material fact. Further, we hold that at trial, PSI must prove, by a preponderance of the evidence, the substance of the relevant policy provisions.

## IV. Expected or Intended Damage Provisions

The trial court found that "the issue of whether the damage was expected is for the trier of fact to decide as it is an issue of material fact what reasonably could have been expected at the time that the occurrence/event/happening took place[.]" Appellant's App. p. 105. The trial court also found that PSI bears the burden of proving that the property damage was neither expected nor intended and that in determining whether PSI expected or intended the damage to occur, an "objective, reasonableness standard" applies. *Id.* at 110–11. Finally, the trial court found:

> Fortuity is a fundamental, basic element of insurance and in order to attach coverage to property damage the occurrence/event/happening must be fortuitous and not intended, planned, or anticipated.
>
> Since fortuity is a basic element in the law of insurance, whether the specific language, referring to the intended or expected property damage falls in the applicable exception of the insurance policy is irrelevant.

*Id.*

PSI argues that its expectation or intent must be judged by PSI's actual subjective knowledge at the time of the conduct giving rise to the property damage at issue. Further PSI contends that the Insurers bear the burden of proving that PSI expected or intended the property damage and that only those Insurers whose policies contain the words "unexpected,"

---

15. This evidence is similar to the evidence submitted by the insured in *Central Illinois Light Company* in which the Illinois Court of Appeals concluded that the trial court erred when it granted the insurer's motion for summary judgment.

16. It is well established in insurance law that "a follow form excess policy incorporates by reference the terms of the underlying policy and is designed to match the coverage provided by the underlying policy." Eric Holmes, 23 Appleman on Insurance 2d § 145.1 at 6 (2003).

"unintended," "accidental," or a similar limitation may rely on the defense.

The Insurers assert that fortuity is a requirement under all of PSI's liability policies regardless of whether the policies contain express "expected or intended" language. Further, they argue that PSI must establish that the property damage for which it seeks coverage resulted from an event that was fortuitous and neither expected nor intended. Finally, the Insurers contend that they are entitled to summary judgment on this issue as a matter of law because the undisputed facts establish that the property damage at issue arose from PSI's deliberate and intentional acts during the manufactured gas process.

### A. Fortuity

PSI argues that the trial court erred "in extending the 'expected or intended damage' defense to **all** of the Insurers." Br. of Appellant at 43 (emphasis in original). PSI asserts that those Insurers whose policies do not specifically require an "accident" or do not define an "occurrence" as accidental damage or unintended or unexpected damage cannot assert the "expected or intended damage" defense. *Id.* The Insurers contend that fortuity is an essential element of insurance policies, and therefore, coverage under the policies is only appropriate where the property damage is unintended or unexpected. Br. of Appellee London Insurers at 24–25.

 Initially, we observe that "exclusions, exceptions, and limitations must be plainly expressed in the policy and the exclusionary clause must bring within its scope the particular act or omission that will bring the exclusion into play." *Am. Family Life Assurance Co. v. Russell,* 700 N.E.2d 1174, 1177 (Ind.Ct.App.1998), *trans. denied.* "Any doubts as to the coverage under the policy will be construed against the insurer in order to further the

policy's basic purpose of indemnity." *Id. See also Hoosier Ins. Co. v. Audiology Found. of Am.,* 745 N.E.2d 300, 307 (Ind. Ct.App.2001), *trans. denied* (Because insurance companies write their policies, the insurer will be bound by the plain, ordinary meaning of its terms as viewed from the perspective of the insured).

In support of their position, the Insurers note that "fortuity is a concept inherent to insurance." *Gen. Housewares Corp. v. Nat'l Sur. Corp.,* 741 N.E.2d 408, 414 (Ind. Ct.App.2000).

> Insurance has been defined as a contract whereby one undertakes to indemnify another against loss, damage, or liability arising from an unknown or contingent event. Implicit in the concept of insurance is that the loss occur as a result of an event that is fortuitous, rather than planned, intended, or anticipated.

*Id.* at 414–15 (internal citations omitted). PSI argues that, under *General Housewares,* "while there is a concept of 'fortuity' generally implied in insurance policies, that concept only gives rise to a 'known loss doctrine[.]'" Br. of Appellant at 44. We believe this argument misconstrues our holding in *General Housewares.*

In *General Housewares,* the insured argued that the trial court erred when it applied the "known loss" doctrine to its third-party liability policies. 741 N.E.2d at 413. Indiana had never recognized the doctrine, which derives from "the fundamental requirement in insurance law that the loss be fortuitous" and provides that "one may not obtain insurance for a loss that has already taken place." *Id.* Our court held that "if an insured has actual knowledge that a loss has occurred, is occurring, or is substantially certain to occur on or before the effective date of the policy, the known loss doctrine will bar coverage." *Id.* at 414. Further, observing

that the "known loss doctrine is not so much an exception, limitation, or exclusion as it is a principle intrinsic to the very concept of insurance," our court also concluded that the known loss doctrine was applicable to the policies at issue even though the doctrine was not expressly stated in the policies. *Id.* at 415 ("[T]he known loss doctrine embodies the fundamental requirement of fortuity in insurance and is therefore applicable to all insurance contracts, unless expressly stated otherwise."). Finally, our court noted that the " 'expected or intended occurrence' exclusions and the known loss doctrine serve different functions" and, therefore, disagreed with those courts that had concluded that the "element of fortuity was sufficiently addressed in the 'expected or intended' language." *Id.* at 416.

 The Insurers argue that the "expected or intended" damage defense can be implied even when not expressly stated in the policy. The Insurers assert, " '[i]mplicit in the concept of insurance is that the loss occur as a result of an event that is fortuitous, rather than planned, intended, or anticipated. This principle is involved in the liability insurance requirements of an accident, occurrence, or the like[.]' " Br. of Appellee London Insurers at 25 (quoting Russ & Segalla, Couch on Insurance 3d § 102:7 (3d ed.1997)). Further, "[a] requirement that loss be accidental in some sense in order to qualify as the occasion for liability of an insurer is implicit, when not express, because of the very nature of insurance." *Id.* (quoting R.E. Keeton, Insurance Law § 5.4(a) at 288 (1971)). The Insurers also rely on a decision from the Wisconsin Supreme Court in which that court determined that even where an insurance policy does not contain any language expressly stating the principle of fortuitousness,

courts read this principle into the insurance policy to further specific public policy objectives including (1) avoiding profit from wrongdoing; (2) deterring crime; (3) avoiding fraud against insurers; and (4) maintaining coverage of a scope consistent with the reasonable expectations of the contracting parties on matters as to which no intention or expectation was expressed.

*Hedtcke v. Sentry Ins. Co.*, 109 Wis.2d 461, 326 N.W.2d 727, 738 (1982) (citation omitted).

 It is generally recognized that "the insurance doctrine of 'implied exception' serves to guard against the hazard of loss intentionally caused by the insured, or arising out of the insured's careless lack of concern." Eric Holmes, 16 Appleman Insurance 2d § 116.1 at 6 (2000). "As used in this context, the phrase *implied exception* refers to a basis for an insurer's nonliability that is not expressed anywhere in the contract but is said to be implicit in the nature of the agreement and the circumstances to which it applies." *Id.* (emphasis in original).

Pursuant to this exception, which is predicated on an application of fortuity, even if there is no express policy language, "there is an implied exception that denies liability insurance coverage for harm ... intentionally inflicted by the insured." *Id.* at 8. Under these basic principles of insurance law and our holding in *General Housewares,* we conclude that the trial court properly determined that all Insurers are entitled to raise the "intended or expected damage" defense regardless of whether the applicable language is expressly stated in the policies at issue.

### B. *Burden of Proof*

 PSI argues that the " 'expected or intended damage' defense in comprehensive liability policies is an *exclusion*" and

it is well-settled under Indiana law that "an insurer seeking to deny coverage bears the burden of proving that any exclusion or other limitation in the policy unambiguously applies." Br. of Appellant at 45 (emphasis in original). Further, PSI contends that "this rule is not altered where the limiting language is contained in an occurrence definition." Id.[17] However, the decisions PSI relies on in making these arguments generally do not support their assertions.

■■■ " 'Generally, a coverage exclusion is an affirmative defense, proof of which is the insurer's burden.' " Hoosier Ins. Co., 745 N.E.2d at 309 (quoting Rozek v. Am. Family Mut. Ins. Co., 512 N.E.2d 232, 234 (Ind.Ct.App.1987)). PSI relies on General Housewares in support of its argument that the "expected or intended" language stated in the insurance policies at issue is an exclusion. While that decision refers to the " 'expected or intended occurrence' exclusions," the case does not discuss whether the expected or intended language operates as an exclusion as a matter of law. Gen. Housewares, 741 N.E.2d at 416.

In response, the Insurers rely largely on Indiana Gas, Inc. v. Aetna Casualty and Surety Company, 951 F.Supp. 790 (N.D.Ind.1996), rev'd on jurisdictional grounds, 141 F.3d 314 (7th Cir.1998), cert. denied. In that case involving substantially the same issues that are presented in this appeal, the court, in dictum, determined that

> the "expected or intended" language is not an exclusionary clause even though, in a sense, it limits the coverage provided. Most of the language in an insurance policy limits coverage to some degree, as to define what is covered will necessarily include what is not covered. Id. at 793. However, as is noted above, the Seventh Circuit vacated the Northern District's decision for lack of jurisdiction pursuant to 28 U.S.C. section 1332(c)(1). 141 F.3d at 319. Despite the fact that the decision has been vacated, the Insurers maintain that the reasoning of the decision is persuasive and should be followed. Br. of Appellee Home Insurance at 25.

Other courts addressing this issue have reached conflicting results. The Vermont Supreme Court recently determined that the burden of proof should be placed on the insurer. State of Vermont v. CNA Ins. Cos. et al., 172 Vt. 318, 779 A.2d 662, 671 (2001). The court first observed that some jurisdictions have held that the insured bears the burden of proof because "[p]roving that the harm was unintentional or unexpected is viewed as merely fulfilling the insured's obligation to show that the property damage falls within the coverage of the policy." Id. (citing Queen City Farms, Inc. v. Cent. Nat'l Ins. Co., 126 Wash.2d 50, 882 P.2d 703, 715 (1994)). The court then rejected this reasoning because under circumstances where the events in question occurred over several decades prior, insureds will likely be unable to produce evidence of their intent at the time of the occurrence. Id.

> Under these circumstances, the most the insured could come forward with are nonprobative, self-serving attestations that it did not expect or intend to cause harm to the environment. Therefore,

---

**17.** Finally, PSI categorizes the "expected or intended damage defense" as an affirmative defense, which the insurers bear the burden of proving. Id. However, in Town and Country Mutual Insurance Co. v. Sharp, 538 N.E.2d 6 (Ind.Ct.App.1989), trans. denied, our court held that because the insured bore the burden of proving coverage as part of establishing a prima facie case against the insurer, when the insurer asserted that the policy did not cover the claim, the insurer "was merely refuting an element of [the insured's] prima facie case and was not required to raise the issue as an affirmative defense." Id. at 9.

coverage is more likely to be denied on legitimate claims—not because the insurer has any reason or evidence to think there is no coverage, but because the insured will be left with proving a negative.

If we place the burden on the insurer, there is a greater likelihood that the coverage issue will be fully aired because the insurer will be required to come forward with some evidence that puts intent at issue. Moreover, the insurer is the party with the incentive to develop such evidence. The insured makes out a prima facie case for coverage by producing evidence of the harm, and the insurer has an opportunity to rebut that case by producing evidence that there was actual intent to harm.

*Id.* at 672 (internal citation omitted).

Similarly, in *Carter–Wallace, Inc. v. Admiral Insurance Co. et al.*, 154 N.J. 312, 712 A.2d 1116, 1126 (1998), the New Jersey Supreme Court concluded that an insurer must bear the burden of proof, regardless of whether the exclusionary language is found in the definition of "occurrence." In doing so, the court determined that "requiring an insured to prove a negative fact—that it did not intend or expect environmental damage—in this context would in our view be highly impractical."[18] *Id.* Further, the court determined that the insurer is "better positioned for" and has an interest in "eliciting facts on the basis of which a trier of fact can conclude that the insured expected or intended environmental damage." *Id.*[19]

Conversely, in *Queen City Farms*, the Washington Supreme Court held that the insured bears the burden of proof.[20] 882 P.2d at 715. In that case, the insured argued that although "there is never coverage where the harm is expected or intended," the insurer should bear the burden of proof because the "expected or intended" language operates as an exclusion. *Id.* The court disagreed stating:

The argument that any limitation on coverage is exclusionary in nature and should be treated as an exclusion is plainly wrong. Under that rationale, literally anything less than the insurer's unconditional promise to pay any amount at any time for any reason and under any circumstances would be an exclusion and the insurer would bear the burden of proof. It would not be necessary for the policyholder to prove

---

**18.** Similarly, in *Milledge v. Oaks*, 784 N.E.2d 926 (Ind.2003), our supreme court, in describing the three approaches courts have taken in addressing the "arising out of" element in unexplained fall worker's compensation cases, rejected the "work-connection" test approach because it "places the employee in the position of attempting to prove a negative." *Id.* at 931 (citing *Town of Montezuma v. Downs*, 685 N.E.2d 108, 116 n. 9 (Ind.Ct.App. 1997), *trans. denied* ("To require the Downs to affirmatively prove that the pipeline was not inspected would require them to prove a negative, something which we refuse to do.")).

**19.** Other courts have also concluded that the insurer bears the burden of proof. *See e.g. Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178, 1205 (2nd Cir.1995) (applying New York law); *Upjohn Co. v. Aetna Cas. & Sur. Co.*, 1994 WL 1029337 at *9–10, 1994 U.S. Dist. LEXIS 11581 at *31–32 (W.D.Mich.1994); *Reliance Ins. Co. v. Walker County et al.*, 208 Ga.App. 729, 431 S.E.2d 700, 702 (1993).

**20.** Similarly, other courts have reached this same result. *See e.g. Aetna Cas. & Sur. Co. v. Dow Chem. Co.*, 28 F.Supp.2d 421, 425 (E.D.Mich.1998) ("The better reasoned cases allocate the burden of proof to the insured because the expected or intended' language is in the part of the policy which is a grant of insurance coverage."); *Quaker State Minit–Lube v. Fireman's Fund Ins. Co.*, 868 F.Supp. 1278, 1295–96 (D.Utah 1994), *aff'd*, 52 F.3d 1522 (10th Cir.1995).

anything to bring its claim within the coverage. That argument betrays a fundamental misunderstanding of the logic and organization of an insurance policy. The coverage language defines the set of all claims that are covered. The exclusions define subsets of claims that, although within the main set, are nevertheless excluded. The coverage language specifies a number of factors that must be present for coverage to exist. That the property damage be "caused by an occurrence" is one of them. It is logical that the policyholder, as claimant, should bear the burden of proof of establishing that its claim is within the coverage of the policy, including that the property damage was caused by an occurrence, and that, once it has done so, the insurer should bear the burden of proof of establishing that the claim is within an exclusion.

*Id.* (quoting Thorsrud, Love & Gottlieb, Insurance Coverage for Pollution Liability in Washington. What Constitutes an "Occurrence?" The Insurer's Perspective, 28 Gonzaga L.Rev. 579, 604 n. 168 (1992–93)).

PSI does not dispute that it bears the burden of proving that it is entitled to coverage under the policies at issue. Further, as is discussed above, "fortuity is a concept inherent to insurance." *See Gen. Housewares,* 741 N.E.2d at 414. As such, the "intended and expected damage" language is more properly categorized as an "exception" rather than an "exclusion." *See* Eric Holmes, 16 Appleman on Insurance 2d § 116.1 at 5 (2000). In addition, we find the reasoning of the Washington Supreme Court in *Queen City Farms* more persuasive than that of those jurisdictions placing the burden on the insurer. We therefore conclude that PSI, the insured, bears the burden of proving that the property damage at issue was neither expected nor intended.[21]

### C. Subjective v. Objective Standard [22]

■ PSI argues that "[w]here an insurance policy excludes coverage for damage that is expected or intended, coverage should be barred only upon a showing of the policyholder's actual subjective expectation or intent to injure." Br. of Appellant at 47–48. PSI contends therefore that the trial court erred when it found that an "objective, reasonableness standard" applies. Relying on *Allstate Insurance Co.*

---

**21.** Similarly, in *Michael v. Wolfe,* 737 N.E.2d 820 (Ind.Ct.App.2000), we observed that the insured bears the burden of proving noninsurance when seeking coverage under the uninsured motorist provision of an automobile liability policy and stated:

In suits by an insured against an insurer claiming a right to coverage under an uninsured motorist provision, the insured must prove that he is legally entitled to recover damages from the owner or operator of an uninsured motor vehicle. Generally, this means that the insured must establish the fault of the tortfeasor, the fact that there is no insurance policy covering the motorist or motor vehicle, and resulting damages. *Id.* at 822.

**22.** Both federal and state courts are "widely divided" on the issue of whether the objective or subjective standard applies. 2–10A The

Law of Liability Insurance § 10A.03 [2a] (2003). However, some courts, which generally apply a subjective standard, do apply an objective standard if certain circumstances are presented. *Id.* For example, the New Jersey Supreme Court has concluded, "in environmental-coverage litigation a case-by-case analysis is required in order to determine whether, in the context of all available evidence, 'exceptional circumstances [exist] that objectively establish the insured's intent to injure.'" *Id.* (citing *Morton Int'l Inc. v. Gen. Accident Ins. Co. of Am.,* 134 N.J. 1, 629 A.2d 831, 880 (1993)). Similarly, other courts applying a subjective standard have also determined that "evidence of what the insured should have known is relevant to the determination of whether the insured expected or intended damage." *Id.*

*v. Herman,* 551 N.E.2d 844 (Ind.1990), the Insurers argue that "Indiana law calls for the application of the objective standard." Br. of Appellee Home Insurance at 30.

In *Herman,* the insured was involved in a fight, and after his wife was struck with a baseball bat, he obtained a gun, fired a shot into the air, then fired four shots in the direction of the fleeing group. 551 N.E.2d at 844. The insurance company argued that the policy excluded the intentional acts of the insured, and therefore, the insured was not entitled to coverage. *Id.* The court observed that the word "intentional 'refers [ ] to the volitional performance of an act with an intent to cause injury, although not necessarily the precise injury or severity of damage that in fact occurs.'" *Id.* at 845 (quoting *Home Ins. Co. v. Neilsen,* 165 Ind.App. 445, 448, 332 N.E.2d 240, 242 (1975)). In his deposition, the insured admitted that he intentionally shot the gun and "intended to hurt somebody." *Id.* The court therefore held that "when [the insured] intentionally fired a gun into the fleeing crowd, of which Herman was a part, he was deliberately committing an act which any reasonable person would deem calculated to cause injury." [23] *Id.* at 846.

In a case decided several years after *Herman,* our court made the following observations with regard to the "standard 'intended or expected' exclusionary clauses:"

The intent aspect ... contemplate[s] the 'volitional performance of an act with an intent to cause injury, although not necessarily the precise injury or severity of damage that in fact occurs.' It is met either by showing an actual intent to injure, or by showing the nature and character of the act to be such that an intent to cause harm to the other party must be inferred as a matter of law.

'Expected' injury means injury that occurred when the insured acted even though he was consciously aware that harm was practically certain to occur from his actions. However, the definition of 'expected' does not exclude harm that the insured 'should have anticipated[.]' Consciousness of the likelihood of certain results occurring is determined by examination of the subjective mental state of the insured.

*Sans v. Monticello Ins. Co.,* 676 N.E.2d 1099, 1102 (Ind.Ct.App.1997), *trans. denied* (quoting *Stevenson v. Hamilton Mut. Ins. Co.,* 672 N.E.2d 467, 470–72 (Ind.Ct.App. 1996), *trans. denied*). Our court has also concluded that negligent and reckless conduct "is not enough to meet the 'practically certain' standard required for an insurance policy to exclude expected injuries." *Coy v. Nat'l Ins. Ass'n,* 713 N.E.2d 355, 360 (Ind.Ct.App.1999) (citing *Bolin v. State Farm Fire & Cas. Co.,* 557 N.E.2d 1084, 1088 (Ind.Ct.App.1990), *trans. denied*). Therefore, even if the evidence demonstrates a disregard for safety, such evidence "is not enough to warrant exclusion under either the lesser 'expected injuries' standard or the greater 'intended injuries' standard." *Id.*

In *Coy,* Robert Adams and Melissa Coy became involved in a high-speed police

**23.** In *Stout v. Underhill,* 734 N.E.2d 717 (Ind. Ct.App.2000), *trans. denied,* the insured caught Stout trespassing on his property and fired three shots in the direction of Stout, who was struck and injured by the bullet. *Id.* at 719. The insured testified that he did not intend to shoot Stout, but fired into the "safe zone" in front of him. Our court concluded that these facts were distinguishable from those in *Herman* holding that "although [the insured] fired shots in the direction of Stout, his deposition testimony makes clear that he was not consciously aware that injury was practically certain to result. *Herman* does not control." *Id.* at 720.

chase in North Carolina. During the chase, Robert drove the car at speeds between 85 and 100 miles per hour and drove toward oncoming traffic. *Id.* at 358. The chase ended when Robert's car collided with another vehicle, flipped, and struck a telephone pole. *Id.* Melissa died as a result of the accident. *Id.* Robert was later charged with and pled guilty to involuntary manslaughter. *Id.* Melissa's mother filed a lawsuit against Robert and as a result of that lawsuit, National Insurance filed a declaratory action to determine its liability on an insurance policy issued to Robert's father. *Id.* Ruling on National Insurance's motion for summary judgment, the trial court found that Robert's actions were intentional and excluded from coverage under the policy. *Id.*

On appeal, our court initially observed that there was no evidence in the record to support an inference that Robert had an actual intent to injure Melissa. *Id.* at 359. We noted the fact that both Robert and Melissa were wearing their seatbelts throughout the chase, and Robert's statements that he did not intend to kill Melissa, but was merely trying to evade the police. *Id.*

However, we next observed that "intent to injure can be inferred in certain situations where actual intent cannot be shown, if the nature and character of the act are such that intent to cause harm must be inferred as a matter of law." *Id.* The rule "applies only where reason mandates that from the very nature of the act, harm to the injured party must have been intend-ed." [24] *Id.* Observing that a "showing of disregard for safety is not enough to warrant exclusion" under the "expected" or "intended" injuries standard, we concluded:

> No evidence in the instant case permits an inference that Robert's actions were performed with the intent to harm Melissa. While Robert was fleeing from police, he violated numerous traffic laws and drove in a negligent and reckless manner. However, driving negligently or recklessly is not a situation where reason mandates that the driver must have intended to harm his passengers. Harm to Melissa was not the intended result of Robert's actions; rather, the harm was an unintended consequence of Robert's intended act (i.e., evading the police). We conclude ... that Robert's actions cannot support the inference that he intended to cause harm to Melissa.

*Id.* at 360. *See also Bolin,* 557 N.E.2d at 1089–90 (an inference of intent to injure did not arise as a matter of law from insured's act of shooting a pellet gun at the rear of the injured party's truck, and therefore, the insured's subjective intent controlled).

In this case, there is simply not sufficient evidence to support an inference of PSI's intent as a matter of law. As will be discussed below, genuine issues of material fact remain concerning whether PSI "expected" or "intended" to cause the property damage at issue. Further, the facts of this case are clearly distinguishable from

---

24. In *Home Insurance Company v. Neilsen,* 165 Ind.App. 445, 332 N.E.2d 240 (1975), the insured struck Smolek with his fist and Smolek was injured. *Id.* at 447, 332 N.E.2d at 242. Although it was undisputed that the insured intended to hit Smolek, the insured argued that he did not intend to inflict the injuries suffered by Smolek. *Id.* We rejected his argument and concluded that the in-sured's intent to harm Smolek could be inferred from the "deliberate blow to Smolek's face." *Id.* at 451, 332 N.E.2d at 244. *See also Wiseman v. Leming,* 574 N.E.2d 327, 329 (Ind.Ct.App.1991), *trans. denied* (where the insured molested a child, the insured's intent to harm the child was inferred as a matter of law, and his subjective intent was irrelevant).

those in *Herman*, where the insured discharged a lethal weapon into a crowd of people. It is therefore more appropriate in this case to apply a subjective standard to determine whether PSI expected or intended to cause the contamination at issue. We acknowledge that it will be difficult to establish PSI's subjective intent because PSI has not operated the MGPs for over sixty years; however, evidence of industry standards and testimony from former employees, where available, will be useful in resolving this issue.

### D. Whether Insurers are Entitled to Judgment as a Matter of Law

In their cross-appeal, the Insurers argue that they are entitled to summary judgment as a matter of law because "the undisputed facts establish that PSI knew that property damage was practically certain to occur by the fact that it manufactured gas and abandoned the tar to the environment." Br. of Appellee Home Insurance at 39. PSI contends that the Insurers "have not submitted any evidence that PSI actually intended to contaminate the groundwater, or knew with certainty that its actions would result in such contamination." Reply Br. of PSI at 20. Consequently, PSI asserts that genuine issues of material fact preclude summary judgment on this issue.

In support of their argument, the Insurers rely on a recent decision from the New Hampshire Supreme Court. In *Energy-North Natural Gas, Inc. v. Continental Insurance Company*, 146 N.H. 156, 781 A.2d 969 (2001), Energy North operated a MGP from approximately 1852 to 1952. *Id.* at 970. Some by-products from the production of gas, such as tar, phenol, and benzene, were released into a sewer line that emptied into an area known as the "Tar Pond" near the Merrimack River. *Id.* Energy North sought indemnification from Continental Insurance after it was ordered to undertake remedial measures at the Tar Pond site in 1996 and spent over 3.5 million dollars doing so. *Id.* Energy North's policies provided coverage for property damage caused by an occurrence that was "neither expected nor intended from the standpoint of the insured." *Id.* at 971. The trial court found that the contamination was not accidental and granted Continental Insurance's motion for summary judgment.

Energy North appealed and argued that summary judgment was inappropriate because there were material facts in dispute. *Id.* Specifically, Energy North asserted that the "state of the gas industry's knowledge at the relevant time was genuinely disputed, particularly by the parties' experts." *Id.* at 974. The New Hampshire Supreme Court, applying an objective, reasonable person standard, held:

Even if the gas industry was not cognizant of the concept of "environmental damage" as we now understand it, Continental's evidence showed that the industry was aware that contamination of water with MGP waste could cause sufficient "real injury" to support a nuisance action. Continental's evidence also showed the industry's knowledge that the harmful nature of MGP waste was due in part to the toxicity of its chemical constituents. "An act is inherently injurious if it is certain to result in some injury, although not necessarily the particular alleged injury." The industry's awareness that its waste could contaminate water to the detriment of its neighbors is sufficient under this test, even if the industry did not understand the term "environment" as it is used today.

*Id.* at 975 (internal citations omitted). Therefore, despite the testimony from Energy North's expert that gas manufacturers were not aware that their operating

and disposal practices were causing long-term damage to the environment, the court affirmed the trial court's finding that Energy North's *"intentional discharge"* of toxic chemicals into a body of water was inherently injurious. *Id.* (emphasis added).

In support of its argument that there are no genuine issues of material fact, the Insurers rely on MGP industry literature from the early twentieth century describing how discharged MGP wastes caused pollution in various waterways, groundwater, and wells. The literature also advised that the practice of storing tar in a "masonry holder tank" should be studied carefully due to the potential for leakage. Appellant's App. p. 5174. The Insurers also point to Indiana's categorization of coal tar as a pollutant in laws enacted in the early 1900s addressing industrial pollutants in "the waters of this State in quantities sufficient to injure or destroy the life of fish inhabiting same." Br. of Appellee Home Insurance at 10 (quoting Ind. Public Law 1899, S. 138). The Insurers submitted newspaper articles addressing the alleged pollution of streams near the Greencastle and Goshen MGPs and testimony from two former employees of the Shelbyville MGP, who stated that a tar and water emulsion was disposed of in two unlined pits at that MGP site. Appellant's App. p. 5163; Commercial Union's App. pp. 275–76, 288, 336. Finally, the Insurers submitted opinions from experts who concluded that the contamination of groundwater occurred as a result of intentional dumping of MGP wastes during the manufactured gas process while the MGPs were in operation. Commercial Union's App. pp. 295–307, 326–56.

In contrast, PSI submitted an opinion from expert Robert Lewis, a groundwater scientist, who concluded that "groundwater and soil at the MGP sites have been contaminated as a result of leakage of tar and water/tar mixtures ('contaminated fluids') from underground containment structures originally designed to hold these fluids." Appellant's App. p. 2965. Similarly, expert William Earley submitted a report in which he determined that contamination at each of the six MGP sites occurred when tar and tar-related constituents escaped from the underground containment structures at each site. Appellant's App. pp. 2935, 2939–40, 2942–43, 2947, 2951, 2954. Earley also concluded that there was no evidence that tars were disposed of by intentional dumping at the MGPs.

Given our review of the materials submitted by the parties, it is clear that the circumstances presented in this case are distinguishable from those addressed by the *EnergyNorth* court. In *EnergyNorth,* it was undisputed that during MGP operations toxic chemicals were intentionally discharged into a sewer line. Here, the parties have submitted conflicting evidence, including expert testimony, with regard to whether leaks from underground containment structures or intentional dumping of MGP wastes resulted in the groundwater contamination at issue. Therefore, genuine issues of material fact remain which must be resolved by the factfinder at trial, and the trial court properly denied the Insurers' motions for summary judgment on this issue.

## V. Trigger of Coverage

The trial court denied PSI's and the Insurers' motions for summary judgment on the "trigger of coverage" question finding that genuine issues of material fact existed concerning when the contamination occurred at the MGP sites. On appeal, both PSI and the Insurers argue that they were entitled to summary judgment on

this issue.[25]

Our supreme court recently considered a trigger of coverage issue in *Allstate Insurance Company v. Dana Corporation*, 759 N.E.2d 1049 (Ind.2001). In *Dana*, Dana Corporation sought indemnification from Allstate, the successor in interest to its excess liability insurer, for certain environmental clean-up costs. *Id.* at 1052. The policies at issue provided that "Allstate will pay 'all sums which [Dana] shall be obligated to pay by reason of the liability ... imposed upon [Dana] by law ... for damage because of [personal injury or property damage] ... caused by an OCCURRENCE.'" *Id.* at 1057. An "occurrence" was defined as "'an accident, event or happening including continuous or repeated exposure to conditions which results, during the policy period, in Personal Injury [or] Property Damage ... neither expected nor intended from the standpoint of the Insured.'" *Id.*

Contamination at the site at issue in *Dana* resulted from the dumping of haz-ardous wastes into strip mine pits in 1978 when drums containing toxic chemicals, which were buried in the pits, broke open releasing the chemicals into the soil. *Id.* at 1060. Despite expert testimony that the contamination continued to cause damage into the 1980s, the trial court found that only the 1978 insurance policy was triggered by the contamination at the site. *Id.* On appeal, Allstate contended that the "1979 policy was also triggered because Dana's contaminants continued causing damage at the site beyond the 1978 policy period." *Id.* Conversely, Dana asserted that the contamination constituted a single occurrence; therefore, only the 1978 policy was triggered.[26] *Id.* Observing that "once a covered occurrence takes place, Allstate is obligated to indemnify Dana for all sums related to that occurrence," the court held, "[i]f contamination caused a covered occurrence in the 1978 policy period, and continued causing damage in the 1979 policy period, that contamination would trigger both policies."[27] *Id.* The court therefore

---

**25.** Courts have generally adopted four approaches to determine how coverage under an insurance policy is "triggered:" 1) the manifestation 2) the injury-in-fact or actual damage 3) the exposure; and 4) the continuous "trigger" theories. Eric Holmes, 23 Appleman on Insurance 2d § 145.3(B)(1) at 13–14 (2003). Under a manifestation theory, "the date of loss is assigned to the policy period when property damage or actual damage is discovered, becomes known to the insured or a third party, or should have reasonably been discovered." *Id.* at 14. "The injury-in-fact trigger of coverage approach implicates all of the policy periods during which the insured proves some injury or damage." *Id.* at 15. Under the exposure theory, "all insurance contracts in effect when the property was exposed to hazardous waste" are triggered. *Id.* at 16. Finally, pursuant to the continuous trigger approach, which has been adopted by most courts, "any policy on the risk at any time during the continuing loss is triggered[.]" *Id.* at 17. Under this theory, it is assumed that "once property damage begins it always continues and that property damage results when property is first exposed to hazardous materials." *Id.*

**26.** With respect to these arguments, the court observed:

On the surface, the parties' respective positions may seem counterintuitive. The insurer is arguing that more than one policy applies and the insured contends only one policy was triggered. However, Allstate is an excess carrier whose liability is triggered only after exhaustion of underlying limits. If Allstate can spread Dana's Old Forge liabilities out over more than one policy year it can take advantage of the full amount of the underlying coverage—from its point of view a deductible—in multiple years.

*Id.*

**27.** Further, our supreme court agreed with this court's conclusion with regard to this issue. *Id.* In our decision, we applied the injury-in-fact trigger approach and stated:

concluded that Allstate's designated evidence, i.e. expert testimony that the contamination continued to cause damage into the 1980s, created a genuine issue of material fact precluding summary judgment in favor of Dana. *Id.* at 1060–61.

### A. *The Policy Language*

There are two definitions of "occurrence" in PSI's numerous liability policies, which the Insurers have specifically asserted render the *Dana* "trigger of coverage" analysis inapplicable to this case. The policies issued by Home Insurance and Commercial Union from 1961 to 1973 define "occurrence" as:

> An event or a continuous or repeated exposure to conditions which unexpectedly results in personal injury, property damage or advertising liability during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence.

Commercial Union's App. p. 13. In policies issued by London Insurers and Home Insurance between 1973 and 1983, "occurrence" is defined as "one happening, or series of happenings arising out of one event, taking place during the term of this policy." Appellant's App. p. 1633.[28] PSI contends that the language of these policies, while not the exact policy language addressed in *Dana*, is substantially similar to that language; therefore, the *Dana*

trigger of coverage analysis applies. Reply Br. of PSI at 27.

#### 1. *The 1961 to 1973 Policies*

■ With regard to the language in these policies, the Insurers assert that "PSI's claims do not trigger coverage because ... the policy requires that the occurrence must 'commence during the policy period,' and it is undisputed that the contamination at issue began before the inception of" the policy periods at issue. Br. of Appellee Commercial Union at 37. Moreover, the Insurers argue that the circumstances presented in *Dana* are distinguishable from those in this case. Specifically, the Insurers argue that PSI is required to prove that there were continued releases of contaminants at the MGP sites during all relevant policy periods, which it has failed to do. Br. of Appellee Commercial Union at 40. In addition, they assert that the *Dana* decision establishes that Indiana courts must apply an "injury-in-fact" trigger for environmental claims.

We agree with the Insurers that our courts are required to apply the "injury-in-fact" trigger of coverage approach. *See Dana,* 759 N.E.2d at 1060–61; *see also Great Lakes Chem. Corp. v. Int'l Surplus Lines,* 638 N.E.2d 847, 853–54 (Ind.Ct. App.1994). However, we disagree with the Insurers' assertion that, in applying that theory to the policy language at issue, PSI must specifically prove that new releases

---

Dana asserts that applying the injury-in-fact trigger to the facts of this case inescapably leads to a conclusion that only the 1978–1979 policy was triggered because the injury was complete when the pollutants first reached the groundwater during the 1978–1979 policy year. We disagree. As we have discussed above, the policies do not preclude continuing exposure to conditions from being an occurrence for the purposes of more than one policy period. At [the site], the evidence demonstrates that the

contamination occurred continuously through several policy periods.
737 N.E.2d 1177, 1202–03 (internal citation omitted).

**28.** Some London policies provide a slightly altered definition of occurrence: "one happening or a series of happenings arising out of *or caused by* one event taking place during the term of this contract." *See* Appellant's App. p. 1725 (emphasis added).

of contaminants caused property damage during the relevant policy periods. While it is true that the Insurers' policies state that the occurrence must "commence during" the policy period, in *Dana* the policies at issue defined property damage as the "loss of or direct damage to or destruction of tangible property ... which *results in an Occurrence during the policy period.*" 759 N.E.2d at 1054 (emphasis added). Therefore, similar to the policies at issue here, the policy in *Dana* required that the "occurrence" take place during the policy period. Further, the definition of occurrence in both the Insurers' policies and the policy in *Dana* includes a continuous or repeated exposure to conditions.

The Insurers also contend that the following provision in their occurrence definition, which is distinct from the policy language in *Dana*, renders the analysis in *Dana* inapplicable: "[a]ll such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence." [29] Br. of Appellee Commercial Union at 33–34. Pursuant to that language, the Insurers assert that PSI must demonstrate that contaminants were actually released during the relevant policy periods.

We disagree with this interpretation of the provision.[30] Reading the provision in the context of the entire occurrence definition, we conclude that the provision is more accurately interpreted as a restriction limiting the insured's ability to file multiple claims against the insurer for damage caused by one continuous occurrence. Consequently, this provision does not support the Insurers' argument that despite the holding in *Dana*, PSI is required to prove that contaminants were actually being released during each policy period. PSI must prove that subjectively unexpected and unintended contamination continued to cause damage during the relevant policy periods to trigger coverage under these policies. *See Dana,* 759 N.E.2d at 1060.

### 2. *The 1973 to 1983 Policies*

■ The Insurers, whose policies define "occurrence" as "one happening, or series of happenings arising out of or caused by one event taking place during the term of" the policy, also contend that their policy language is distinguishable from the policy language addressed in *Dana*. The Insurers argue that the "policies at issue here unambiguously require that the casual events causing or giving rise to the property damage for which coverage is sought to take place during the policy period. The difference between this 'one event' language and other common triggers of coverage is significant and was overlooked by" the trial court. Br. of Appellee London Insurers at 12. Under the Insurers' interpretation of the occurrence definition, the "initial 'one event' in the

29. We observe that the remaining provision in the occurrence definition at issue is substantially similar to the occurrence definition in *Dana*.

30. We note that construction of the terms of a written contract is a pure question of law for the court. *Harrison v. Thomas,* 761 N.E.2d 816, 818 (Ind.2002). "Although some 'special rules of construction of insurance contracts have been developed due to the disparity in bargaining power between insurers and insureds, if a contract is clear and unambiguous, the language therein must be given its plain meaning.'" *Beam v. Wausau Ins. Co.,* 765 N.E.2d 524, 528 (Ind.2002) (quoting *Allstate Ins. Co. v. Boles,* 481 N.E.2d 1096, 1101 (Ind.1985)). However, "'[w]here there is ambiguity, insurance policies are to be construed strictly against the insurer' and the policy language is viewed from the standpoint of the insured." *Bosecker v. Westfield Ins. Co.,* 724 N.E.2d 241, 244 (Ind.2000) (quoting *Am. States Ins. Co. v. Kiger,* 662 N.E.2d 945, 947 (Ind.1996)).

causal chain" must occur during the policy period. *Id.* at 14.

In support of this argument, the Insurers cite to the vacated *Indiana Gas* decision and *Long Island Lighting Co. v. Allianz Underwriters Insurance Co.*, 301 A.D.2d 23, 749 N.Y.S.2d 488 (N.Y.App.Div. 2002). In *Indiana Gas, Inc. v. Aetna Casualty and Surety Company*, the insured argued that this same occurrence definition was ambiguous and should therefore be construed in its favor. 951 F.Supp. 780, 789 (N.D.Ind.1996), *rev'd on jurisdictional grounds*, 141 F.3d 314 (7th Cir.1998), *cert. denied*. The court disagreed and stated:

> Interpreting the "occurrence" language to provide coverage for "any happening . . . taking place during the term of this contract" would, . . . ignore the plain meaning of the sentence by ignoring the restrictive "arising out of or due to one event" language. Thus, this court holds that the plain meaning of the language, when read as a complete sentence as intended, is to require that the "event" and not the "happening" take place during the term of the contract.

*Id.*

In *Long Island Lighting*, the court determined that the issue before it was "whether the ongoing migration or leaching of preexisting contaminants through the soil, which for our purposes we will assume continued during the policy period, can be deemed to constitute an 'occurrence' under the contractual definition of that term." 749 N.Y.S.2d at 494. In resolving the issue the court stated:

> The contractual definition of "occurrence" expressly requires that the loss be occasioned by "one event taking place during the term of this contract." To accept [the insured's] argument that the continuing leaching or migration of preexisting contaminants after the closing of the plants should be deemed to

constitute the "event taking place during the term of this contract" (under the definition of "occurrence"), we would have to ignore the fact that the definition requires that the "event taking place during the term of this contract" be the *cause* of the "happening or series of happenings" immediately giving rise to the loss. It would be illogical to deem the continuing migration of preexisting contaminants to be both the damage itself and the cause of the damage[.]

*Id.* at 495 (emphasis in original). *See also Cessna Aircraft Co. v. Hartford Accident and Indem. Co.*, 900 F.Supp. 1489, 1504 (D.Kan.1995) (citing *Babcock & Wilcox Co. v. Arwright–Boston Mfg. Mut. Ins. Co.*, 53 F.3d 762, 766, 768 (6th Cir.1995)) ("From this [policy] language, the court concludes that the policies unambiguously require an *occurrence*, as opposed to property damage, *during the policy period*. . . . Exposure of groundwater to contaminants which occurs during the policy period could constitute an event within the meaning of the policy language.") (emphasis in original).

PSI contends that the occurrence definition is ambiguous, and that it is not clear whether the "happening," "series of happenings," or "one event" must take place during the policy period. Reply Br. of PSI at 27. PSI also asserts that "the 'happening,' or the 'series of happenings,' or the 'event' are all plausible descriptions of the continuous contamination of groundwater." *Id.* We disagree.

The occurrence definition clearly requires the "happening" or "series of happenings" to arise out of (or to be caused by) one event, which takes place during the policy period. Further, the language of these policies is distinguishable from the occurrence definition of the policies in *Dana* and the 1961 to 1973 policies discussed above, which contain the phrase "a

continuous or repeated exposure to conditions." The *Dana* court specifically relied on that language in reaching its conclusion in that case. *See Dana*, 759 N.E.2d at 1060. However, if PSI proves at trial that subjectively unexpected and unintended leaks were occurring from the subsurface containment structures and causing contamination of the groundwater during the relevant policy periods, such leaks would constitute an event within the meaning of the policy language. *See Cessna Aircraft*, 900 F.Supp. at 1504.

### B. *The Evidence Submitted in Support of the Summary Judgment Motions*

 On the trigger of coverage issue, PSI submitted the expert testimony and reports of Keith Loague, a professor of geological and environmental sciences and hydrogeology consultant, Thomas Helfrich, an environmental and geotechnical consultant, and Robert Lewis, a groundwater scientist.

In his report, Professor Loague opined that 1) "subsurface structures at the MGP sites, which contained tar, are the sources of impact to the unsaturated near-surface and groundwater" and 2) "the escape of constituents of interest from the MGP sites, from the subsurface structures, to the unsaturated near surface and groundwater has taken place over many years, including at least each year between 1940 and 1985, inclusive." Appellant's App. p. 3262. In his deposition, Loague was asked:

Q: Have you formulated an opinion with a reasonable degree of scientific certainty that each of the structures that you modeled leaked contaminate during the period 1940 to 1985?

A: It's my opinion that they—there's no indication that they didn't leak and there's lots of indication that they did leak. Even looking at the observed data

in the '90's, if these structures were not leaking there wouldn't be hits in the monitoring wells.

So there's lots of cause and effect information out there that the structures have leaked; both looking at remediated sites and looking at the observation, and then using kind of the kind of the concept development simulations that I did suggesting that these estimates of kind of the impact for these different boundary-value problems is reasonable.

Appellant's App. pp. 2518–19.

In his report, addressing the MGP sites at issue, Thomas Helfrich concluded that "the frequency of tar and tar-related constituents from the subsurface containment structures [at each MGP site] has taken place every year ... until the time, if any, that the subsurface containment structure and/or its contents are removed, including at least the years between 1950 and 1985 inclusive." Appellant's App. pp. 2795–2801. Further, he opined that

[t]he frequency of the escape of tar and tar-related constituents from the subsurface containment structures at the [ ] MGP site[s] would have been greater after gas making ceased because 1) the structures would have aged and deteriorated with the passage of time and become more susceptible to cracking from disruptive events; 2) when making gas there was typically some form of inventory control and inspection that would have detected cracks in structures and the necessary repairs would have been made; and 3) the hydraulic pressure inside the subsurface containment structures would have been greater for a longer period of time after the MGP stopped making gas.

*Id.* Finally, Helfrich stated that various environmental, geological, and disruptive

events caused cracking in the containment structures. *Id.*[31]

In his report, Robert Lewis stated that "[g]roundwater and soil at the MGP sites have been contaminated as a result of leakage of tar and water/tar mixtures ('contaminated fluids') from underground containment structures originally designed to hold these fluids." Appellant's App. p. 2965. Further, in his opinion, "[c]ontaminated fluids leaked from underground containment structures continuously or episodically after structure retirement and the removal of aboveground apparatus. The decommissioning and leakage period generally includes (but may not be limited to) the period 1950–1985." *Id.* Lewis also stated that there is continued leakage from those structures that remain in place. *Id.* Finally, Lewis opined:

> The volume of contaminated fluids leaked after structure retirement and removal of above ground apparatus was larger than the volume of fluids leaked prior to this time.
>
> Accidents, which may include floods, tornadoes, severe thunderstorms, plant explosions, and fires, may cause relatively instantaneous releases of contaminated fluids from underground containment structures.

*Id.*

The Insurers submitted the reports and testimony of experts Richard Hughto and Robert Karls, an environmental consultant. In his report, Richard Hughto stated that "tars, other wastes, and contaminants observed at the sites were released to the soil, groundwater, and surface water as multiple releases from multiple sources as a result of and during the period of MGP operations at all of the sites." Commercial Union's App. p. 297. Further, he opined that releases likely occurred as a result of "material handling during operations" and intentional dumping, and "[n]one of the information indicates that there were contaminant releases after the plant operating periods." *Id.* at 298. Finally, Hughto stated that no evidence was presented that "cracking of MGP structures [ ] caused contaminant releases" and "there is actually evidence of many of the former MGP structures having integrity and likely not leaking." *Id.*

In his deposition, Hughto testified while that it would not be impossible for tar to have leaked from the containment structures, in his opinion, there was no evidence that there were releases from the structures at the Lafayette MGP during the 1950 to 1985 time period. Appellant's App. pp. 5922–23. However, he also stated that in his opinion there were likely releases of tar contaminates to the environment after the MGPs at Goshen, Lafayette, and Shelbyville ceased operations. Appellant's App. p. 2407. Further, Hughto testified that "there was contamination with MGP constituents present in the groundwater at" each MGP site during the 1950 to 1985 time period. Appellant's App. pp. 5918–19.

Robert Karls testified that while it is possible that contaminants were released after the periods of MGP operation, that "it's more probable than not that the vast majority of the material was released during the operating lifetime." Appellant's App. p. 2421. Karls also testified, "I don't think based on my understanding of the site conditions that any releases occurring

---

**31.** However, defense expert George Davis stated that in his opinion, "PSI Energy has not demonstrated that any of the disruptive events described by Mr. Thomas Helfrich in his report dated June 4, 2001 significantly damaged the structures or [were] reasonably likely to have damaged the structures or caused any specific leakage or release of contaminants from the structures at each of the six MGP sites." Appellant's App. p. 5926.

during that time [1950 to 1985] would have been significant in comparison to the releases during the operational period." Appellant's App. p. 5842. However, when asked whether in his opinion "to a reasonable degree of scientific certainty that between 1940 and 1985 no contamination was being released from soils into the groundwater at these sites," Karls responded "No, that is not my opinion." Appellant's App. p. 2425. Karls also stated that it was possible that there were releases from the containment structures during 1950 to 1985, but that "it would be speculation to say that it actually occurred." *Id.* Finally, in his report, with regard to each site, Karls opined:

> The constituents of concern were released to soil, surface water, and ground water during the periods of operation of the Site when manufactured gas was produced. Constituents of concern remain in the soil and ground water to this day, although the total quantity would be less than when originally released at those locations.

Appellant's App. pp. 5849, 5853, 5859, 5864–65, 5868, 5872.

### C. *Conclusion*

The trigger of coverage analysis applied in *Dana* is applicable to this case and requires that PSI prove that the contaminants caused property damage during each policy period under which it seeks coverage. The conflicting expert testimony has created a genuine issue of material fact. However, under the 1973 to 1983 policies, which contain the "one event" language, PSI must demonstrate that a subjectively unexpected and unintended event, such as a leak from a subsurface containment structure, occurred and caused property damage during each policy period. Therefore, the trial court properly denied PSI's and the Insurers' motions for summary judgment on this issue.

## VI. Motion to Strike Helfrich Expert Opinion

During the summary judgment proceedings, London Insurers filed a motion to strike Thomas Helfrich's expert opinion, and several other Insurers joined in that motion. The trial court denied the motion to strike. In their cross-appeal, the Insurers argue that the trial court abused its discretion when it denied the motion.

■■■■ The decision to admit or exclude proffered expert testimony is entrusted to the sound discretion of the trial court. *Merrill v. Knauf Fiber Glass GmbH*, 771 N.E.2d 1258, 1263 (Ind.Ct.App. 2002), *trans. denied.* We will reverse the trial court only if its decision is clearly against the logic and effect of the facts and circumstances. *Id.*

Indiana Evidence Rule 702 "assigns to the trial court a 'gatekeeping function' of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Hannan v. Pest Control Serv., Inc.,* 734 N.E.2d 674, 679 (Ind.Ct.App.2000), *trans. denied.* Pursuant to Rule 702:

> (a) If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

> (b) Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable.

Ind. Evidence Rule 702. Under this Rule, "evidence which is not first established to be reliable under 702(b) will not 'assist' the judge or jury pursuant to 702(a). Therefore, reliability is a threshold issue for a

[Rule] 702 analysis of scientific evidence." *Wallace v. Meadow Acres Manufactured Hous., Inc.*, 730 N.E.2d 809, 813 (Ind.Ct. App.2000), *trans. denied.*

 Further, "when faced with a proffer of expert scientific testimony, the court must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Hannan*, 734 N.E.2d at 679. "Scientific knowledge admissible under [Evidence Rule] 702 connotes more than subjective belief or unsupported speculation." *Id.* Consequently, expert testimony must be supported by appropriate validation or "good grounds" based on what is known in establishing a standard of evidentiary reliability. *Steward v. State*, 652 N.E.2d 490, 498 (Ind.1995). Generally, whether a theory or technique can be empirically tested is a key question to be resolved in determining whether that theory or technique constitutes scientific knowledge that will assist the trier of fact. *Hannan*, 734 N.E.2d at 679. Another relevant consideration is whether the theory or technique has been subjected to peer review and publication. *Id.* "Widespread acceptance can be an important factor in ruling whether particular evidence is admissible under [Evidence Rule] 702 and a technique that has attracted only minimal support may properly be viewed with skepticism." *Id.* However, while such factors are useful, there is no specific "test" or set of "prongs" that must be considered in order to satisfy Rule 702(b). *Wallace*, 730 N.E.2d at 813.

 In Helfrich's opinion, leaks of tar and tar-related constituents from the subsurface containment structures are the direct result of the masonry and concrete material used to construct the structures, the age of the structures, which were mostly built in the late 1800s, and

> the cumulative effect of disruptive events that caused the separation of mortar joints and new and wider cracks to develop continuously in these structures, including during the years 1950 to 1985. These disruptive events include the settlement of the structures in the surrounding soil, small but periodic seismic events in the area of the MGP sites, vibrations from railroad traffic adjacent to the MGP site, and vibration from demolition and construction activity at or near the MGP site. In addition, there are hydraulic factors at work, such as the constant infiltration of rainwater, which result in the contamination of that water with tar-related constituents and the escape of that contaminated water through mortar joints, breaks or overflows.

Appellant's App. p. 6275.

As a basis for his opinion, Helfrich relied on his training and experience as an engineer and his areas of specialization which include "the performance of engineered structures in soils and the investigation and remediation of subsurface contamination." Appellant's App. p. 6269. He also relied on 1) evidence concerning the demolition and construction activities that occurred around each site; 2) evidence that there were railroad lines in the immediate vicinity of each site; 3) evidence that after decommissioning, most of the subsurface containment structures were uncovered and exposed to rainwater; and, 4) his knowledge of hydraulic pressure inside a fully saturated structure. *Id.* at 6275–76. Helfrich also "personally inspected some of the subsurface containment structures at each site" and observed cracks in structure walls. *Id.* at 6274. Further, he relied on his observations at over 150 MGP sites not at issue in this case, which include obser-

vations of nearly sixty excavated MGP containment structures. *Id.* at 6276.

Helfrich admitted that it is not possible to verify his cumulative effects theory through "specific observations, measurements or calculations." *Id.* at 6276. However, he also stated:

> As an engineer with experience in subsurface structures, these observations are simply not consistent with initial settlement cracks that occur just after the time of construction.... The extensive separation of masonry joints and cracking of concrete that is visible in MGP structures today must have been taking place throughout the later life of those structures. The cumulative effect of small disruptive events is the only logical explanation for this subsequent separation of mortar joints and cracking and breaking of the structures.

*Id.* at 6276.

The Insurers argue that Helfrich's "cumulative effects" theory is inadmissible because the theory: "1) could not be empirically tested; 2) had not been peer-reviewed or even written down; 3) contained no standard or other bases for applying the theory; and 4) was not shown to be accepted (or even heard of) within the relevant scientific community." Br. of Appellee London Insurers at 20. In support of its argument, the Insurers cite Helfrich's deposition testimony in which the following exchange occurred:

> Q: Is this cumulative effect approach that you have applied to your valuation of these sites and these structures published anywhere that you are aware of, this approach, the theory, the technique that you applied; is it in any published material anywhere?
>
> A: You seem to be inferring as if there's maybe some sort of standard out there that says how to do what I did in this case. And, you know, there isn't.

Again, this is one of those things that I think is very individualistic. You are asked to evaluate a situation, and in doing so in this case I've decided what I think is appropriate to do that. And I've done that. But, you know, I'm not aware of any such thing that relates to this specific type of analysis out there.

London Insurer's App. pp. 78–80.

In response, PSI contends that the issues involved in this case do not involve complex scientific principles, and Helfrich "developed a reasoned opinion of the general causes for these subsurface escapes" of contaminants. PSI argues that in doing so Helfrich properly relied on 1) his education, training, and expertise; 2) his experience in studying approximately 150 other MGP sites; 3) his observation of over sixty excavated MGP structures at those sites; and, 4) his observations specific to this case, which include viewing the cracks present in certain excavated structures and the tar that was present in exposed mortar joints and cracks in those structures. Reply Br. of PSI at 47–48. PSI also asserts that our supreme court's decision in *McGrew v. State*, 682 N.E.2d 1289 (Ind.1997), is instructive in our resolution of this issue.

In *McGrew*, the trial court admitted an Indiana State Police analyst's testimony concerning hair comparison analysis for hair specimens that were collected from the defendant's vehicle. *Id.* at 1289–90. In a hearing outside of the jury, the analyst was asked what scientific principle he used as the basis for the reliability of the hair sample technique. *Id.* at 1290. The analyst explained that he simply uses a microscope to make " 'a physical comparison of one hair to another' ... looking at several 'different physical characteristics.' " *Id.* When questioned with regard to the statistical error ratio for hair comparison as compared to the ratio for blood

or DNA typing, the analyst stated that "he was not aware of any statistics with regards to 'the probability of a hair sample belonging to someone else,' due to the nature of hair comparison." *Id.* at 1291. The analyst also testified that hair comparison analysis was generally accepted in the scientific community and that he was aware of no articles or journals that dispute the method. *Id.*

Our supreme court affirmed the trial court's decision that the analyst's testimony was admissible and stated:

> Inherent in any reliability analysis is the understanding that, as the scientific principles become more advanced and complex, the foundation required to establish reliability will necessarily become more advanced and complex as well. The converse is just as applicable, as demonstrated by the trial court's conclusion that "what we're talking about is not the traditional scientific evaluation. We are talking about simply a person's observations under a microscope." This conclusion is not unlike our recent statement in Jervis that the evidence at issue was more a "matter of the observations of persons with specialized knowledge" than "a matter of 'scientific principles' governed by Indiana Evidence Rule 702(b)."

*Id.* (citation omitted).

Initially, we observe that the Insurers do not dispute that Helfrich is an expert in his field. The Insurers also do not raise any argument that the disruptive events described by Helfrich did not or could not cause the cracks that Helfrich personally observed in certain structures at the sites at issue. Upon review of his testimony and report, we disagree with the Insurers argument that Helfrich's "cumulative effects" theory is based on complex scientific principles.

It is clear from the record before us that Helfrich has extensive experience in investigation and remediation of MGP subsurface structures and contamination. While Helfrich did apply scientific principles in forming his theory, the concepts he relied upon, such as vibrations from a passing train, are relatively simple and within the knowledge of a common layperson. Consequently, we agree with PSI that Helfrich's theory is reliably based on his observations and application of his specialized knowledge to those observations. Moreover, it is important to note that Helfrich's theory will be subject to cross-examination at trial. *See Sears Roebuck & Co. v. Manuilov*, 742 N.E.2d 453, 461 (Ind.2001) (stating that once the trial court is satisfied that the expert's testimony will assist the trier of fact and that the expert's general methodology is based on reliable scientific principles, then the accuracy, consistency, and credibility of the expert's opinions may properly be left to vigorous cross-examination, presentation of contrary evidence, argument of counsel, and resolution by the trier of fact). Under these circumstances, the trial court did not abuse its discretion when it denied the Insurers' motion to strike the testimony of Thomas Helfrich.

## Conclusion

Remaining genuine issues of material fact permeate this case thereby precluding an entry of summary judgment. Consequently, we affirm the trial court's denial of summary judgment with regard to expected or intended damage, trigger of coverage, and notice issues, but reverse the trial court's grant of summary judgment to the Insurers on the lost policies issue. Also, the trial court properly denied Commercial Union's motion for partial summary judgment with regard to whether there was a justiciable controversy at five of the six MGP sites. Finally, the trial court did not abuse its discretion when it

denied the Insurers' motion to strike Helf-rich's expert testimony.

Affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion.

NAJAM, J., and ROBB, J., concur.