**INDIANA FARMERS MUTUAL INSURANCE COMPANY,**
**Appellant–Plaintiff,**

v.

**NORTH VERNON DROP FORGE, INC., Roger Crane, Douglas Dibble, Edward Reid, and Glen White, Appellees–Defendants.**

No. 40A05–0904–CV–220.

Court of Appeals of Indiana.

Dec. 15, 2009.

Rehearing Denied Feb. 4, 2010.

Mark R. Smith, Smith Fisher Maas & Howard, P.C., Indianapolis, IN, Attorney for Appellant.

R. Davy Eaglesfield, Courtney B. Justice, Justice Law Office, Logansport, IN, Attorneys for Appellees.

## OPINION

VAIDIK, Judge.

### Case Summary

The defendant insureds agreed to provide a third party with "clean fill" dirt from their steel forge. The fill dirt turned out to be contaminated. The third party sued the insureds for depositing contaminated waste on his property. The complaint alleged intentional and unintentional torts, breach of contract theories, and strict liability causes of action. The defendants' commercial general liability insurer filed this action seeking declaration that it had no duty to defend the insureds in the underlying suit. In the course of summary judgment proceedings, the insured forge owner testified via affidavit that he did not know the fill dirt was contaminat-

ed. The trial court entered summary judgment in favor of the insureds. We hold that (1) the forge owner's affidavit testimony may be considered along with the underlying complaint when assessing the insurer's duty to defend, (2) the factual allegations sufficiently disclose an unintended "occurrence" requiring the insurer to defend in the underlying suit, (3) coverage is not foreclosed by the policy's intentional acts exclusion, (4) the insurer was not prejudiced by untimely notice of occurrence, and (5) the trial court erroneously ordered indemnification before the conclusion of the underlying litigation. We affirm in part and reverse in part.

### Facts and Procedural History

North Vernon Drop Forge ("NVDF") was a steel fabricator that manufactured parts for automobiles, trains, and agricultural equipment. The forge was located in North Vernon, Indiana. Edward Reid was the owner, Roger Crane was an officer, and Glen White and Douglas Dibble were employees at various points in time. NVDF maintained a commercial general liability ("CGL") insurance policy with Indiana Farmers Mutual Insurance Company ("IFMI"). The insurance policy required IFMI to defend and indemnify NVDF in lawsuits alleging bodily injury or property damage arising from "occurrences" within the coverage period. The policy provided in pertinent part:

### SECTION I—COVERAGES

### COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

 a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property dam-

age" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages . . . .

\* \* \* \* \* \*

 b. This insurance applies to "bodily injury" and "property damage" only if:

 (1) The "bodily injury" or "property damage" is caused by an "occurrence" . . . .

\* \* \* \* \* \*

**2. Exclusions**

This insurance does not apply to:

 **a. Expected Or Intended Injury**

 "Bodily injury" or "property damage" expected or intended from the standpoint of the insured . . . .

\* \* \* \* \* \*

### SECTION IV—COMMERCIAL GENERAL LIABILITY CONDITIONS

**2. Duties In The Event of Occurrence, Offense, Claim Or Suit**

 a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim.

 . . .

\* \* \* \* \* \*

### SECTION V—DEFINITIONS

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

Appellant's App. p. 646–47, 655, 657.

NVDF's steel forging operations produced a conglomeration of mill scale, de-

bris, baghouse dust, and refractory brick and stone. These materials would typically accumulate on the factory property while it was in business. But when the forge closed in July 2004, NVDF had to clean up its premises and dispose of its waste.

David Reed meanwhile owned an auction barn in Scipio, Indiana. David wanted to improve his business's parking lot to better serve customers. In 2004 David sought clean fill dirt for the parking lot renovations. He placed a handwritten sign in front of his property that read, "Clean Fill Wanted."

Glen noticed David's sign and saw an opportunity for NVDF to dispose of its waste materials. Either Glen or Roger contacted David and told him the NVDF had clean fill available. Glen met David at the NVDF property and again represented to him that NVDF could provide clean dirt fill. Glen told David that the fill posed no environmental problems and would make a good top coat for the parking lot. At some point Glen also received approval from Edward to give David the fill. The fill dirt was a gift for which David would not have to provide consideration.

NVDF began depositing the fill onto David's property in October 2004. The following November, however, the Indiana Department of Environmental Management (IDEM) received a complaint that NVDF was dumping contaminated waste onto the lot. The following timeline summarizes what happened next:

**November 2004:** IDEM inspects the NVDF premises and orders NVDF to determine whether its fill dirt materials are hazardous.

**February 7, 2005:** IDEM sends a violation letter to Roger requesting a hazardous waste determination for the fill deposited on the David Reed property.

**March 2005:** Edward hires Douglas to work for NVDF.

**December 21, 2005:** IDEM again inspects the NVDF real estate.

**January 12, 2006:** IDEM sends a letter to Douglas requesting a hazardous waste determination for the fill deposited on the David Reed property.

**August 9, 2006:** IDEM issues a Notice of Violation to NVDF for unlawfully depositing contaminated waste on the David Reed property. IDEM warns NVDF that it could be penalized up to $25,000 per day for each of its regulatory violations. Edward Reid learns that NVDF's dirt fill is regulated waste requiring disposal at a landfill.

**Early 2007:** Douglas hires Midwest Environmental Services, Inc. ("Midwest") to determine if NVDF's fill material is hazardous.

**May 10, 2007:** Midwest determines that the fill is non-hazardous.

**August 7, 2007:** IDEM and NVDF execute an agreed order requiring NVDF to stop releasing and depositing contaminated waste. The order does not impose fines or require NVDF to take further action with respect to the David Reed property.

**August 27, 2007:** IDEM issues a Notice of Violation to David Reed requiring him to excavate the waste on his property.

**September 2007:** David notifies Edward that he received a Notice of Violation from IDEM.

**November 19, 2007:** David files a complaint against NVDF, Edward, Glen, Douglas, and Roger.

**January 30, 2008:** NVDF notifies IFMI of the complaint and requests defense and indemnification.

**May 2008:** David files his first amended complaint.

David's amended complaint alleged that Edward and Glen "knew the industrial waste from [NVDF's] Industrial Drive Factory was not suitable as fill material," that the NVDF factory "was the site of piles contaminated industrial waste that Edward Reid wanted to dump," and that the NVDF employees "falsely told [David] that the Industrial Drive Factory had clean fill available." Appellant's App. p. 264, 269. David alleged the insured's dumping led to the continued release of hazardous substances onto his property. The complaint set forth several causes of action including: (1) violation of Indiana Code section 13–30–9–1, et seq., for contributing to the release of hazardous substances, (2) violation of Indiana Code section 13–30–3–13 for dumping contaminated industrial waste, (3) fraud and fraudulent conspiracy, (4) nuisance, (5) trespass, (6) unjust enrichment, (7) negligence and negligence per se, (8) breach of warranty, (9) breach of warranty/breach of contract, and (10) reckless endangerment. The negligence count alleged as follows:

101. The Reid Entities and White were under a duty to dispose of industrial waste in a reasonable, prudent, and lawful manner to prevent environmental contamination.

102. The Reid Entities and White breached this duty by dumping contaminated industrial waste in violation of Indiana Law and IDEM standards for environmental protection.

103. The Reid Entities, White, and Dibble were under a duty to cor-

rect the hazards posed by the improper dumping of industrial wastes in the public parking lot of the David Reed Property.

104. The Reid Entities White, and Dibble breached this duty by failing to correct the hazards posed by the improper dumping.

105. The Reid Entities, White, and Dibble are liable for damages from their negligence.

*Id.* at 279. David's complaint sought damages for, among other things, (1) past and future costs of investigating the waste and cleaning up his property, (2) the costs to IDEM in supervising the investigation and clean-up, (3) penalties assessed by IDEM, (4) lost market value to the auction barn property, and (5) lost wages.

IFMI denied coverage to NVDF in a letter dated May 2, 2008. IFMI also initiated this action seeking declaration that it had no duty to defend or indemnify NVDF. Both sides moved for summary judgment.

Edward submitted an affidavit in support of the insured defendants' summary judgment motion. Edward testified that he was unaware the fill materials from NVDF were contaminated. He agreed to provide David with the fill because he "believed there was nothing wrong with it," and he "had no idea at the time it occurred, that allowing NVDF's fill dirt being placed upon David Reed's property would violate the law." *Id.* at 496, 497. Edward explained that NVDF had on prior occasions disposed of its waste at a landfill, and that the waste was classified by the landfill as non-hazardous. "Since our waste had been tested and classified as non-hazardous previous to David Reed's visit, I believed that it was not regulated

dirt." *Id.* at 498. He further testified that "[n]o one at NVDF ever intended to harm David Reed or his property at the time of the gift to him of the fill, nor did anyone at NVDF expect that Mr. Reed's property would be damaged as he now claims." *Id.* at 497. IFMI objected to the use of Edward's affidavit testimony because it contradicted the allegations in David Reed's complaint. IFMI also moved to strike portions of the affidavit on various evidentiary grounds.

The trial court (1) denied IFMI's motion to strike, (2) denied IFMI's motion for summary judgment, and (3) granted NVDF's motion for summary judgment. The trial court ordered that

> Plaintiff shall defend NORTH VERNON DROP FORGE, INC., DOUGLAS DIBBLE, EDWARD REID, ROGER CRANE, and GLEN WHITE as their respective interests may require, against the lawsuit brought against them by HUGH DAVID REED . . ., reimburse these Defendants for the reasonable and necessary litigation costs and attorney's fees incurred to date in defending the Jennings Superior Court case, and indemnify each Defendant up to the limits of coverage required by the policy in the same Jennings Superior Court lawsuit referenced above.

*Id.* at 10–11. IFMI now appeals.

### Discussion and Decision

The purpose of summary judgment under Indiana Trial Rule 56 is to terminate litigation about which there can be no factual dispute and which may be determined as a matter of law. *Bushong v. Williamson,* 790 N.E.2d 467, 474 (Ind.2003). On appeal, our standard of review is the same as that of the trial court: summary judgment is appropriate only where the evidence shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Williams v. Riverside Cmty. Corr. Corp.,* 846 N.E.2d 738, 743 (Ind.Ct.App.2006), *trans. denied.* A fact is "material" if its resolution would affect the outcome of the case, and an issue is "genuine" if a trier of fact is required to resolve the parties' differing accounts of the truth or if the undisputed material facts support conflicting reasonable inferences. *Williams v. Tharp,* 914 N.E.2d 756, 761 (Ind.2009). We construe all facts and reasonable inferences drawn from those facts in favor of the nonmoving party. *Riverside,* 846 N.E.2d at 743. The fact that the parties filed cross motions for summary judgment does not alter our standard of review. *Merrill v. Knauf Fiber Glass GmbH,* 771 N.E.2d 1258, 1264 (Ind.Ct.App.2002), *trans. denied.* We consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law. *The Winterton, LLC v. Winterton Investors, LLC,* 900 N.E.2d 754, 758 (Ind.Ct.App.2009), *trans. denied.*

▆▆▆ Insurance contracts are governed by the same rules of construction as other contracts, and the proper interpretation of an insurance policy, even if it is ambiguous, is generally a question of law appropriate for summary judgment. *Liberty Ins. Corp. v. Ferguson Steel Co., Inc.,* 812 N.E.2d 228, 230 (Ind.Ct.App.2004). If the policy language is clear and unambiguous it should be given its plain and ordinary meaning. *Eli Lilly Co. v. Home Ins. Co.,* 482 N.E.2d 467, 470 (Ind.1985). An ambiguity does not exist simply because a controversy exists between the parties, each favoring an interpretation contrary to the other. *Linder v. Ticor Title Ins. Co.*

*of Cal., Inc.,* 647 N.E.2d 37, 39 (Ind.Ct. App.1995). Under Indiana law, an insurance policy is ambiguous if reasonable persons may honestly differ as to the meaning of the policy language. *Id.* If the terms of a written contract are ambiguous, it is the responsibility of the trier of fact to ascertain the facts necessary to construe the contract. *Perryman v. Motorist Mut. Ins. Co.,* 846 N.E.2d 683, 687 (Ind.Ct.App. 2006). Where there is ambiguity, insurance policies are to be construed strictly against the insurer. *Am. States Ins. Co. v. Kiger,* 662 N.E.2d 945, 947 (Ind.1996), *reh'g denied.*

■■ Indiana law is clear that the duty to defend is broader than the duty to indemnify. *Liberty Mut. Ins. Co. v. OSI Indus., Inc.,* 831 N.E.2d 192, 200 (Ind.Ct. App.2005). If the policy is otherwise applicable, the insurance company is required to defend even though it may not be responsible for all of the damages assessed. *Id.*

## I. Background

IFMI and NVDF's insurance contract is a standard CGL insurance policy. "Commercial general liability policies are designed to protect the insured against losses to third parties arising out of the operation of the insured's business." 9A Steven Plitt, Daniel Maldonado and Joshua D. Rogers, COUCH ON INSURANCE § 129:2 (3d ed.2005). More specifically, they are "intended to provide coverage to the insured for tort liability for physical injury to the person or property of others." *Id.* § 129:10.

The policy requires IFMI to defend and indemnify NVDF in lawsuits alleging "bodily injury" or "property damage" caused by "occurrences" within the coverage peri-od. It is undisputed that this case does not involve bodily injury to a third party. Rather, by at least seeking damages for the costs of "cleaning up the contaminated industrial waste on the Reed Property," the underlying complaint alleges "property damage" within the contemplation of the CGL policy. *See Hartford Acc. & Indemt. Co. v. Dana Corp.,* 690 N.E.2d 285, 298 (Ind.Ct.App.1997) (concluding that the "ordinary meaning of [property] 'damages' is so broad that it encompasses . . . environmental response costs" (quoting *Farmland Indus., Inc. v. Republic Ins. Co.,* 941 S.W.2d 505, 511 (Mo.1997))), *trans. denied.*

■ The principal question is whether the property damage to David's property was caused by an "occurrence" as the CGL policy requires. An "occurrence" is defined by the policy as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." An accident is "an unexpected happening without an intention or design." *Terre Haute First Nat'l Bank v. Pac. Employers Ins. Co.,* 634 N.E.2d 1336, 1338 (Ind.Ct.App.1993).

## II. Edward Reid's Affidavit Testimony

### *A. Extrinsic Evidence and the Duty to Defend*

Our first sub-issue is whether Edward Reid's affidavit is appropriate for consideration in resolving this case. Edward submitted his affidavit in support of the insured's motion for summary judgment. Edward testified to his understanding of the underlying events, and he claimed that he did not know NVDF's fill dirt was contaminated. The purpose of the affidavit was to show that the alleged wrongdoing in this case was an "accident" within the purview of NVDF's insurance policy.

IFMI moved to strike Edward's testimony. IFMI argues that its duty to defend should be determined solely on the face of David Reed's complaint, which for the most part alleges intentional conduct not implicating coverage under the CGL policy.

Indiana courts have previously held that "[t]he duty to defend is determined solely by the nature of the complaint." *Transamerica Ins. Serv. v. Kopko,* 570 N.E.2d 1283, 1285 (Ind.1991). In *Kopko,* the insured was trustee of a land development. *Id.* at 1284. The trustee was notified of defective conditions in his land development's subsoil. *Id.* The Reynolds couple purchased a home on the development property, and their home sank due to subsoil instability. *Id.* The Reynolds sued the trustee alleging deliberate tort and fraud. *Id.* The trustee sought coverage from his insurer Transamerica, and in an attempt to invoke coverage under his policy, the trustee testified that he negligently forgot about the sub-soil problems. *Id.* at 1285. The Supreme Court held that the damage to the Reynolds' house was not an "accident" and that the insurer therefore had no duty to defend. *Id.* With regard to the trustee's proffered testimony, the Court held

> Kopko's attempt to defend and to explain his action by saying he merely "forgot" is possibly a matter of defending against the allegations in the Reynolds' complaint. However, it does not change the theory of that complaint, which sounds entirely in intentional tort and fraud.
>
> Whether in subsequent litigation he may convince a jury that his forgetfulness should excuse him, this does not change the theory of the plaintiffs' case, upon which Transamerica is entitled to

rely in declining to defend Kopko for his alleged deliberate and fraudulent conduct. Under the theory of the complaint, the occurrence of the subsidence of the house certainly was not "an accident neither expected nor intended" so far as Kopko was concerned.

> The duty to defend is determined solely by the nature of the complaint. Accordingly, Kopko's proposed defense to the complaint, that he "forgot," does not change the nature of the action. . . .

*Id.* at 1285 (citation omitted).

Some courts still cite *Kopko* as representing the current state of Indiana law. *See, e.g., Ace Rent–A–Car, Inc. v. Empire Fire & Marine Ins. Co.,* 580 F.Supp.2d 678, 689 (N.D.Ill.2008) ("[T]he Seventh Circuit has held that it remains bound to *Kopko* until the Indiana Supreme Court holds otherwise, which it has not done."). But several Indiana Court of Appeals panels have decried *Kopko* and declined to follow it. *See, e.g., Wayne Twp. Bd. of Sch. Comm'rs v. Ind. Ins. Co.,* 650 N.E.2d 1205, 1208 (Ind.Ct.App.1995) ("[I]n evaluating the factual basis of a claim and the insurer's concomitant duty to defend, this court may properly consider the evidentiary materials offered by the parties to show coverage." (citing *Trisler v. Ind. Ins. Co.,* 575 N.E.2d 1021, 1023 (Ind.Ct.App.1991))), *reh'g denied, trans. denied.*

 In any event, our Supreme Court has more recently entertained extrinsic, designated evidence when assessing an insurer's duty to defend. *See Auto–Owners Ins. Co. v. Harvey,* 842 N.E.2d 1279, 1291 (Ind.2006). In *Harvey,* the insured defendant Gearheart pushed his girlfriend Brandy off a boat ramp and into a river. *Id.* at 1281. Brandy drowned, and her family brought a

wrongful death action against Gearheart. *Id.* at 1281, 1282. The complaint alleged that Gearheart's negligence and recklessness caused Brandy's death. *Id.* at 1282. Gearheart sought coverage under a homeowner's insurance policy issued to his parents. *Id.* In determining whether the incident fell within a policy exclusion for injury reasonably expected or intended, the Supreme Court explained as follows:

> In the summary judgment proceedings in the present case, the designated evidence includes Gearheart's statements expressly denying any intent or expectation to cause bodily injury to Brandy and explaining the circumstances of his push of Brandy. To overcome these, Auto–Owners emphasizes evidence regarding the physical dimensions of the boat ramp, Gearheart's knowledge of Brandy's proximity to its edge, Gearheart's awareness of his own size and strength as compared to Brandy, and that Gearheart's push of Brandy caused her to slip and fall into the river. This evidence is definitely not so overwhelming as to mandate us to conclude that Gearheart must have intended to harm Brandy. Because Auto–Owners has failed to demonstrate the absence of a genuine issue of material fact regarding Gearheart's intent to harm Brandy, the trial court was correct to deny summary judgment on the Auto–Owners claimed application of the coverage exclusion.

*Id.* at 1291. The Supreme Court thus looked beyond the "eight corners" of the insurance policy and third-party complaint in determining the extent of the insured's defense coverage. We understand *Harvey* to permit consideration of evidence extrinsic to the underlying complaint when assessing an insurer's duty to defend. And more specifically, we understand *Harvey*

to permit consideration of an insured's self-serving testimony denying intent and favoring coverage. We therefore follow *Harvey* and consider Edward Reid's affidavit testimony in connection with David Reed's complaint. *See also* 9 COUCH ON INSURANCE § 126:3 (3d ed. 2008) ("[T]he insured is entitled to rely upon facts outside the complaint to favor a coverage position. . . ."); *Am. Econ. Ins. Co. v. Holabird & Root,* 382 Ill.App.3d 1017, 1022, 320 Ill.Dec. 97, 886 N.E.2d 1166, 1171 (Ill. Ct.App.2008) ("The question of coverage should not hinge on the draftsmanship skills or whims of the plaintiff in the underlying action.").

### B. Evidentiary Objections to the Affidavit Testimony

IFMI also objects to Edward's affidavit on various evidentiary grounds. IFMI argues that Edward's affidavit contains both inadmissible hearsay and unfounded statements as to the intent of other persons. Edward testified, for example, that he learned from conversations with Glen and Roger that David was interested in acquiring NVDF's excess dirt. He testified to the results of IDEM's analyses and to the conclusions reached in Midwest's environmental reports. Edward also claimed that "[n]o one at NVDF ever intended to harm David Reed," that "there was never any intent by me or anyone at NVDF to violate any IDEM rules regarding solid waste," and that "no one at NVDF ever intended to cause Mr. Reed damage to his real estate . . . ."

 The decision to admit or exclude evidence lies within the sound discretion of the trial court. *Strack & Van Til, Inc. v. Carter,* 803 N.E.2d 666, 670 (Ind.Ct. App.2004). The trial court's determination is afforded great discretion on appeal. *Id.*

To that end, we will not reverse the trial court's decision absent a showing of manifest abuse of discretion. *Id.* An abuse of discretion occurs when the trial court's decision is against the logic and effect of the facts and circumstances before it. *Illiana Surgery & Med. Ctr., LLC. v. STG Funding, Inc.,* 824 N.E.2d 388, 399 (Ind. Ct.App.2005).

Affidavits in support of or in opposition to a motion for summary judgment are governed by Indiana Trial Rule 56(E), which provides, in relevant part: "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." The requirements of T.R. 56(E) are mandatory; hence, a court considering a motion for summary judgment should disregard inadmissible information contained in supporting or opposing affidavits. *Price v. Freeland,* 832 N.E.2d 1036, 1039 (Ind.Ct.App. 2005). Further, the party offering the affidavit into evidence bears the burden of establishing its admissibility. *Duncan v. Duncan,* 764 N.E.2d 763, 766 (Ind.Ct.App. 2002), *reh'g denied, trans. denied.*

Hearsay is not admissible except as provided by law or by other court rules. Ind. Evidence Rule 802. " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ind. Evidence Rule 801(c). Evidence Rule 602 further provides that a "witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."

We agree with IFMI that Edward was not competent to testify to the other NVDF employees' intentions. His claims that no one "ever intended to harm David Reed," that "there was never any intent by . . . anyone at NVDF to violate any IDEM rules regarding solid waste," and that "no one at NVDF ever intended to cause Mr. Reed damage to his real estate," were unfounded and thus inadmissible. We also agree that, to the extent Edward's affidavit offers various third-party statements for their truth, it may present inadmissible hearsay. However, we understand most of the third-party assertions to simply illustrate Edward's understanding of the circumstances in question, to explain his subsequent conduct, and to demonstrate his personal lack of intent in ratifying the deposit of contaminated waste onto David's property.

Regardless, the key allegations that Edward "agreed that Reed could have the fill from NVDF, as at the time [Edward] believed there was nothing wrong with it and there was no problem with it," and that Edward "had no idea at the time it occurred, that allowing NVDF's fill dirt being placed upon David Reed's property would violate the law," are neither hearsay nor unfounded. We therefore consider Edward's affidavit testimony at least for those propositions. *See Harvey,* 842 N.E.2d at 1291 (entertaining, for purposes of summary judgment, insured's statements "expressly denying any intent or expectation to cause bodily injury").

### III. Interpretation of the Insurance Policy

#### A. Occurrence

The central issue is whether the factual allegations disclose an "occurrence" pursuant to NVDF's CGL policy such that IFMI has a duty to defend. An "occurrence" is defined by the policy "an accident, includ-

ing continuous or repeated exposure to substantially the same general harmful conditions." An accident is "an unexpected happening without an intention or design." *Terre Haute First Nat'l,* 634 N.E.2d at 1338.

 The unintended consequence of an intentional act may qualify as an "occurrence" for insurance purposes. *Harvey,* 842 N.E.2d at 1291. As noted above, *Harvey* involved an insured defendant Gearheart who pushed his girlfriend Brandy into a river but did not intend that she drown. *Id.* at 1281–83. Gearheart's insurer denied coverage in the subsequent wrongful death action, insisting that Brandy's death did not result from an "occurrence" under the homeowner's insurance policy. *Id.* at 1283. The insurer argued "that Brandy's death was the natural and probable result of Gearheart's voluntary and intentional act of pushing, and thus her death should not be considered an 'accident' for insurance purposes." *Id.* Our Supreme Court disagreed. *Id.* at 1285. The Court held that "occurrence" could refer either to Gearheart's intentional pushing or to Brandy's accidental drowning. *Id.* at 1284. The Court construed the ambiguity against the insurance company and read "occurrence" to refer to the drowning. *Id.* at 1285. The Court "decline[d] to hold that Brandy's drowning death, even though resulting from Gearheart's conscious and intentional act of pushing her, necessarily falls outside the concept of 'accident' upon which 'occurrence' is defined in the Auto–Owners insuring agreement." *Id.*

 In light of *Harvey,* we are persuaded that the allegations in this case reveal an "occurrence" implicating IFMI's duty to defend. There is no question that NVDF intentionally dumped its dirt fill onto David's property. The parties had an agreement that NVDF would do so. But according to his affidavit, Edward was unaware that the fill dirt was regulated waste that required disposal at a landfill. Edward testified that "[s]ince our waste had been tested and classified as non-hazardous previous to David Reed's visit, I believed that it was not regulated dirt." Appellant's App. p. 498. The designated evidence therefore indicates that Edward—NVDF's owner, sole shareholder, supervisor, employer, etc.—did not intend the dumping's injurious and unlawful consequences—i.e., the alleged leaching of contaminants into the David Reed property—when he ratified NVDF's deposit of the fill dirt. *Cf. Huntzinger v. Hastings Mut. Ins. Co.,* 143 F.3d 302, 314 (7th Cir. 1998) (knowingly dumping wastes onto land renders intentional whatever leeching and environmental damage may follow); *Standard Const. Co., Inc. v. Md. Cas. Co.,* 359 F.3d 846, 850 (6th Cir.2004) ("[T]he dumping was an 'occurrence' or 'accident' within the meaning of the policy because, while the dumping was intentional, the fact that it was done without permission, thus making it wrongful, was not intended by the insured.").

 Moreover, by setting forth the negligence claim in his amended complaint, David in part alleged unintentional conduct by NVDF. We remain wary that the underlying factual allegations—as opposed to the complaint's "legal labels"—determine the duty to defend. *See* 9 Couch on Insurance § 126:3 (3d ed. 2008) ("[T]he legal theory asserted by the claimant is immaterial to the determination of whether the risk is covered.... [A] claim clearly excluded from policy coverage cannot be turned into a covered risk by styling the pleadings to fit the policy language."); *Jim*

*Barna Log Sys. Midwest, Inc. v. Gen. Cas. Ins. Co. of Wis.*, 791 N.E.2d 816, 825 (Ind. Ct.App.2003) ("[A]n allegation of negligence is not necessarily an allegation of accidental conduct as defined in the context of a commercial general liability insurance policy."), *trans. denied.* But this case presents both a negligence count in the third-party complaint along with allegations of unintentional conduct in the insured's supplemental affidavit. The amended complaint's allegations of unintentional tort, in conjunction with Edward's affidavit testimony, support the finding of an accident within the purview of the CGL policy. We therefore hold that the totality of the designated evidence discloses an "occurrence" requiring IFMI to defend NVDF in the underlying suit.

IFMI nonetheless argues that the contaminated dumping could not constitute an "occurrence" because it was the breach of a contractual obligation. Our Supreme Court recently explained that the term "occurrence" does not contemplate professional error, poor business performance, or breach of contract. *Tri–Etch*, 909 N.E.2d at 1003. In *Tri–Etch*, the decedent was a liquor store clerk. *Id.* at 999. The liquor store would close at midnight, at which time an employee would ordinarily set the store alarm. *Id.* The store's security service was supposed to call the store manager within thirty minutes if the alarm was not set. *Id.* One night, shortly before closing, a robber abducted the clerk, tied him to a tree, and severely beat him. *Id.* The security service did not call the manager until 3:30 a.m. *Id.* The clerk was found at 6:00 a.m. and died later that day. *Id.* The clerk's estate brought a wrongful death action against the operator of the security service. *Id.* The estate alleged that the security service was negligent for not calling the manager within thirty minutes, and that if the service had acted promptly, the clerk would have been found earlier and survived. *Id.* Our Supreme Court held that the incident did not constitute an "occurrence" for the purposes of the security company's CGL policy. *Id.* at 998–99. The Court explained that the security service's omission was a professional error analogous to a lawyer's malpractice. *Id.* at 1001. The security service's failure may have fallen under "errors and omissions" coverage but not under a CGL policy. *Id.* The Court explained that "[b]usiness risk occurs as consequence of the insured not performing well and is component of every business relationship that is necessarily borne by the insured in order to satisfy customers." *Id.* at 1003 (quoting 9A Couch on Insurance § 129:1 (3d ed.2005)). The Court further noted that " 'occurrences' ordinarily do not include contractual obligations." *Id.* (quoting 9 Couch on Insurance § 126:29 (3d ed.2008)).

We do not believe the principles clarified in *Tri–Etch* affect the outcome of this case. NVDF did not have a contract with David to provide him with fill dirt for the parking lot. The fill was a "gift" and not supported by consideration. Nor was NVDF in the business of selling, donating, or depositing fill dirt. NVDF was a steel forge, and it chose to provide David with the fill as a convenient and inexpensive way to clean up the factory property. In short, NVDF's contaminated dumping was not a case of poor business performance, professional error, or breach of contract. It was a collateral, gratuitous undertaking performed incident to the cessation of NVDF's forging operations. *Tri–Etch* is therefore inapposite.

For the reasons stated, we hold that the alleged leaching of contaminants onto the

David Reed property was an occurrence implicating IFMI's duty to defend.

## B. Exclusion for Damage Reasonably Expected or Intended

NVDF's CGL policy states that the insurance does not apply to " 'property damage' expected or intended from the standpoint of the insured." Having concluded that the factual allegations fit an "occurrence" pursuant to the CGL policy, we next address whether coverage is precluded by the policy's intentional acts exclusion.

■■■■ "In contrast to the insurance policy's insuring agreement that requires the *occurrence* to be accidental, this exclusion more narrowly considers whether the resulting *injury or damage* was intentional or reasonably expected by the insured." *Harvey*, 842 N.E.2d at 1288. Intent to injure can be inferred in certain situations where actual intent cannot be shown, if the nature and character of the act are such that intent to cause harm must be inferred as a matter of law. *Id.* at 1290; *PSI Energy, Inc. v. Home Ins. Co.*, 801 N.E.2d 705, 729 (Ind.Ct.App.2004), *trans. denied.* Such inference "applies only where reason *mandates* that from the very nature of the act, harm to the injured party *must* have been intended." *Harvey*, 842 N.E.2d at 1290 (quoting *PSI*, 801 N.E.2d at 729). Likewise, "even if the evidence demonstrates a disregard for safety," such evidence is insufficient to warrant exclusion for expected or intended injuries. *Id.* at 1290 (quoting *PSI*, 801 N.E.2d at 728).

[I]n determining a motion for summary judgment, a court may find no genuine issue of material fact as to whether designated evidence calls for the application of an exclusion for injuries "intended by an insured." But to do so, the party moving for summary judgment must convince the court that the evidence is so overwhelming as to mandate the court to conclude that, from the very nature of an insured's actions, harm must have been intended. The "no genuine issue of fact" requirement for summary judgment may be satisfied by such certainty in the level of proof.

*Id.* at 1291.

■■■■ For essentially the same reasons enumerated above, we find that the "expected or intended" exclusion is inapplicable. Edward testified that he did not know that NVDF's fill dirt was contaminated waste. The subsequent leaching of contaminants was an unintended consequence of the dumping. According to the allegations in his affidavit, therefore, Edward could not have expected or intended the resulting damage to the David Reed property. We therefore hold that the policy's intentional acts exclusion does not bar coverage.

## IV. Notice

NVDF's CGL policy required NVDF to notify IFMI "as soon as practicable of an 'occurrence' or an offense which may result in a claim." IFMI argues that NVDF did not provide timely notice of occurrence in accordance with the policy.

■■■■ The notice requirement is material and of the essence in an insurance contract. *Askren Hub States Pest Control Serv., Inc. v. Zurich Ins. Co.*, 721 N.E.2d 270, 277 (Ind.Ct.App.1999). The duty to notify an insurance company of potential liability is a condition precedent to the company's liability to its insured. *Id.* When the facts of the case are not in dispute, what constitutes reasonable notice is a question of law for the court to decide. *Id.* at 278.

■■■■■ Unlike other policy provisions requiring the cooperation of the insured, noncompliance with notice of claim provisions resulting in an unreasonable delay triggers a presumption of prejudice to the insurer's ability to prepare an adequate defense. *Miller v. Dilts,* 463 N.E.2d 257, 265 (Ind.1984), *reh'g denied, see also Tri-Etch,* 909 N.E.2d at 1005 (reaffirming *Miller* ). As our Supreme Court has explained:

> The requirement of prompt notice gives the insurer an opportunity to make a timely and adequate investigation of all the circumstances surrounding the accident or loss. This adequate investigation is often frustrated by a delayed notice. Prejudice to the insurance company's ability to prepare an adequate defense can therefore be presumed by an unreasonable delay in notifying the company about the accident or about the filing of the lawsuit. This is not in conflict with the public policy theory that the court should seek to protect the innocent third parties from attempts by insurance companies to deny liability for some insignificant failure to notify.

*Miller,* 463 N.E.2d at 265. The presumption of prejudice means that if the delay in giving the required notice is unreasonable, the burden falls on the insured to produce evidence that prejudice did not actually occur in the particular situation. *Erie Ins. Exch. v. Stephenson,* 674 N.E.2d 607, 612 (Ind.Ct.App.1996). Where the insured presents sufficient evidence to rebut the presumption, the burden shifts back to the insurer to establish prejudice. *Liberty Mut. Ins. Co.,* 831 N.E.2d at 203.

### A. Unreasonable Delay

■■■■ Our first task is to determine whether NVDF's notice to IFMI was un-reasonably delayed. NVDF began receiving communications from IDEM in November 2004. Over the next two years, IDEM inspected the NVDF premises at least twice and made multiple requests for NVDF to complete a hazardous waste determination. Although these initial interactions may have raised red flags on their own, the critical date in our opinion is August 9, 2006. On that date IDEM issued an official Notice of Violation to NVDF for unlawfully depositing contaminated waste onto the David Reed parking lot. IDEM warned NVDF that it could be penalized up to $25,000 per day for each of its violations. Edward Reid also learned at this point that NVDF's dirt fill was regulated waste requiring disposal at a landfill. Therefore, at least by August 9, 2006, NVDF was aware that it had been dumping regulated contaminants onto a third party's private property. We conclude that by that date, NVDF had knowledge of an occurrence or offense which could "result in a claim."

NVDF points out that it had reached an "agreed order" with IDEM in August 2007 which imposed no fines and required no further action by NVDF at the Reed lot. NVDF also stresses that Edward Reid did not hear about David Reed's own Notice of Violation until September 2007. NVDF therefore argues that "it was only after Ed Reid was notified of IDEM's action against David Reed, in September 2007, that he had a reasonable expectation that the conduct covered in the earlier IDEM communications would culminate in any harm to David Reed, and could be considered an occurrence as defined by the Policy." Appellees' Br. p. 26. We disagree. The fact is that by August 2006 NVDF knew it had been depositing contaminated waste onto David's lot. Regardless of whether NVDF reached an agreed order with IDEM and

had not yet been informed of IDEM's actions against David, NVDF knew it had likely damaged private property and that the property would require cleanup and excavation. *Cf. Erie Ins. Exch.*, 674 N.E.2d at 611 ("The insurance company was entitled to notice as soon as possible after the accident regardless of whether [the insured] anticipated that a claim would be filed."); *see also Joslyn Mfg. Co. v. Liberty Mut. Ins. Co.*, 939 F.Supp. 603, 607–08 (N.D.Ill.1996). We conclude that by August 9, 2006, NVDF had knowledge of an occurrence and thereafter had a duty to notify IFMI.

It is undisputed that NVDF did not provide notice of the occurrence to IFMI until January 30, 2008. NVDF therefore waited approximately one and one-half years before notifying IFMI of the contaminated dumping. We find as a matter of law that NVDF's notice was unreasonably delayed. *Cf. Sagendorf v. Selective Ins. Co. of Am.*, 293 N.J.Super. 81, 679 A.2d 709, 716 (1996) (holding notice unreasonably delayed, where Department of Environmental Protection issued Spill Act Directive in January 1986 and insured notified insurer in August 1987); *Indus. Coatings Gr., Inc. v. Am. Motorists Ins. Co.*, 276 Ill.App.3d 799, 213 Ill.Dec. 317, 658 N.E.2d 1338, 1344–45 (1995) (holding notice unreasonably delayed, where insured received letter from Environmental Protection Agency about hazardous waste disposal in February 1986 and notified insurer in April 1987), *overruled on other grounds by Employers Ins. of Wausau v. Ehlco Liquidating Trust*, 186 Ill.2d 127, 237 Ill.Dec. 82, 708 N.E.2d 1122, 1137 (1999); *Champion Spark Plug Co. v. Fid. & Cas. Co. of New York*, 116 Ohio App.3d 258, 687 N.E.2d 785, 790 (1996) ("[R]easonable minds could only conclude that the seriousness was apparent when [the in-

sured] received notice from the EPA that [the insured] was identified as a party liable for cleanup costs and that the sites were assigned to a priority list.").

### B. Prejudice

The next question is whether IFMI suffered prejudice as a result of the delay. In line with the above mentioned authority, we presume IFMI suffered prejudice from delayed notice unless and until NVDF comes forward with evidence to rebut the presumption.

■■■■■ NVDF argued during summary judgment proceedings that

[i]t is clear from the insurers [sic] arguments raised in its briefs, that regardless of the timing of any notice to Indiana Farmers that it would not change its decision to deny its duty to defend the insureds.... Indiana Farmers cannot suffer prejudice from late notice, if an earlier notice would have only resulted in an earlier denial of coverage.

Appellant's App. p. 817. In other words, NVDF argued that IFMI was not prejudiced by late notice because it would have denied coverage on other grounds anyway. Our Supreme Court recently held that an insurer's denial of coverage on other grounds does not, as a matter of law, rebut the presumption of prejudice from late notice. *Tri–Etch*, 909 N.E.2d at 1005. If there is no prejudice to the insurer from lack of notice, the absence of prejudice does not arise from the insurer's taking the position that it also has other valid defenses to coverage. *Id.* Rather, it arises from the insurer's taking no action with respect to the claim because of its other defenses. *Id.* It is a fact issue whether the other defenses would have caused the insurer, if given timely notice, to do nothing with respect to the claim. *Id.*

 Having acknowledged that, we believe the remaining evidence, allegations, and circumstances presented in this case rebut as a matter of law any presumption of prejudice from NVDF's delayed notice. First, NVDF safeguarded IFMI's interest by cooperating with IDEM and complying with the August 2006 Notice of Violation. *See Wolf Lake Terminals, Inc. v. Mut. Marine Ins. Co.,* 433 F.Supp.2d 933, 952 (N.D.Ind.2005) ("The presumption of prejudice is rebutted by evidence that the insureds 'adequately safeguarded the [insurers'] interests by assuming the defense' of the contamination claims." (quoting *Sherwin–Williams Co. v. Certain Underwriters at Lloyd's London,* 813 F.Supp. 576, 589 (N.D.Ohio 1993))). Moreover, this situation is unlike an automobile accident or arson case, for example, where the litigants need to produce percipient witnesses, collect transient physical evidence, reconstruct instantaneous events, etc. *See, e.g., Koenig v. Bedell,* 601 N.E.2d 453, 456 (Ind.Ct.App.1992) (car accident victim "did not demonstrate that the scene of the accident had not changed, that the witnesses were still available, or that their memories of the incident had not faded over the passage of time to the extent that [the insurer] could still meaningfully investigate the claim"). Here it is undisputed that NVDF dumped contaminated waste onto David Reed's property. The only material issues in the underlying suit are what representations NVDF made to David Reed and whether NVDF knew the fill materials were contaminated.

IFMI maintains that it is prejudiced because the scope of contamination and IDEM—mandated cleanup increased in the time it was not notified. However, those issues go to the extent of IFMI's indemnification—not to IFMI's prejudice in defending NVDF from liability in the underlying suit. *See also PSI,* 801 N.E.2d at 717 n. 9 (insurers alleged that evidence was lost or destroyed without describing any of the evidence specifically).

Accordingly, we find that NVDF has shown IFMI was not prejudiced by delayed notice. IFMI's late notice therefore does not bar defense coverage under the CGL policy.

## V. Indemnification

 The trial court's order required IFMI to "indemnify each Defendant up to the limits of coverage required by the policy." IFMI argues that the trial court erroneously ordered indemnification at this point in the proceedings. We agree. Although we have concluded that IFMI has the duty to defend NVDF in the underlying suit, IFMI's duty to indemnify cannot be assessed until litigation has concluded. NVDF even concedes that "[i]t is clear that the policy requires coverage for only harms that were unintended and unexpected," and "the liability to David Reed for any unintended and unexpected harm cannot be determined until after a trial." Appellees' Br. p. 29, 30. We conclude that the indemnification order was premature. To the extent the trial court's order already requires IFMI to indemnify the defendant insureds, we reverse it.

In conclusion, we affirm summary judgment in favor of NVDF, Edward Reid, Glen White, Roger Crane, and Douglas Dibble, but we reverse that portion of the trial court's judgment ordering untimely indemnification.

Affirmed in part and reversed in part.

BAILEY, J., and BRADFORD, J., concur.